IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____ **06-80700**

CIV-RYSKAMP.

BRANDON BUTZBERGER, a minor, by
and through his parent and natural guardian
DAVID BUTZBERGER,

MAGISTRATE JUDGE
VITUNAC

Plaintiff

v.

NOVARTIS PHARMACEUTICALS
CORPORATION, a Delaware corporation,

Defendant.

_____/

**NIGHT BOX FILED**

JUL 2 0 2006

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant Novartis

Pharmaceuticals Corporation ("NPC" or "Defendant"), by and through its undersigned

counsel, hereby gives notice that it is removing the above-captioned matter from the

Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida,

Case No. 502006CA006104XXXXMB (AB), to the United States District Court for the

Southern District of Florida. The grounds for removal are set forth below.

## STATE COURT ACTION

1.      On or about June 20, 2006, Plaintiff commenced a civil action by filing a

complaint, couched as a Bill of Discovery, (the "Complaint") against NPC in the Circuit

Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, as Case

No. 502006CA006104XXXXMB (AB) (the "State Court Action"). NPC was served

with the summons and Complaint in the State Court Action on June 30, 2006.  A copy of

the Summons and Complaint served on NPC is attached within Composite Exhibit A[1].

2.       NPC has not answered the Complaint.

3.       As more fully set forth below, this case is properly removed to this Court

pursuant to 28 U.S.C. § 1441.  Defendant has satisfied the procedural requirements for

removal, and this Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1441(a).

## THE PARTIES

4.       Upon information and belief, Plaintiff is a resident of Palm Beach County,

Florida.

5.       As set forth in the Complaint, NPC is a Delaware corporation with its

principal place of business in East Hanover, New Jersey.

## AUTHORITY FOR REMOVAL

## I.    NPC Has Satisfied the Procedural Requirements for Removal

6.       Removal is timely.  NPC was served with a copy of the Complaint on June

30, 2006.  *See* Exhibit A (copy of all process, pleadings, and orders served upon NPC,

including the summons and complaint).  This Notice of Removal is being filed within 30

days of the first date on which NPC received a copy of the Complaint through service,

and so is timely pursuant to 28 U.S.C. § 1446(b).

7.       Venue is proper.  The Circuit Court of the Fifteenth Judicial Circuit in and

for Palm Beach County, Florida is located within the Southern District of Florida, and,

therefore, venue is proper in this Court pursuant to 28 U.S.C. § 115(a)(2) because it is

---

[1] No proof of service has been filed in the State Court Action reflecting service of the Complaint on NPC. However, in the interest of expediency and for purposes of removal, NPC will concede that it was served with the Complaint on June 30, 2006.

"the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

    8.     No further proceedings have been had in the State Court Action.

    9.     No previous application has been made for the relief requested herein.

    10.    A copy of the written notice required by 28 U.S.C. § 1446(d) is attached as Exhibit B and is being filed in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida and served on Plaintiff.

## II.    <u>Removal is Proper in This Case</u>

    11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of costs and interest.

### A.    Complete diversity exists between Plaintiff and Defendant.

    12.    The Complaint does not set forth the state or county of residence of the plaintiff. However, for venue to be proper in the court in which the Complaint was filed, the plaintiff would have to be a resident of Palm Beach County. Furthermore, on information and belief, the plaintiff is, in fact, a resident of and citizen of Palm Beach County, Florida. *See* Asset Search identifying David Butzberger as living in West Palm Beach, Florida, attached as Exhibit C.

    13.    NPC is, and has been at all relevant times, a corporation incorporated under the laws of the State of Delaware, *see* Compl. ¶ 2, with its principal place of business in the State of New Jersey. For purposes of determining jurisdiction pursuant to 28 U.S.C § 1332(c)(1), therefore, NPC is not a citizen of the state of Florida.

**B.   The amount in controversy requirement is satisfied.**

14.   The complaint is titled a "Complaint For Pure Bill of Discovery," and fails to provide an explicit amount in controversy. However, this does not preclude removal. Under Florida law, there is "one form of pleading," and a Complaint For Pure Bill of Discovery may freely be amended to add substantive counts against the defendant. *See Perez v. Citibank*, 328 F. Supp. 2d 1374, 1377-78 (S.D. Fla. 2004) (upholding removal of a Pure Bill of Discovery to federal court in part due to the fact that it can be amended to add substantive causes of action).[2] A Complaint For Pure Bill of Discovery is employed to gather additional information allegedly needed to bring substantive counts. *See, e.g., Adventist Health System/Sunbelt Inc. v. Hegwood*, 569 So.2d 1295 (Fl. Dist. Ct. App. 1990) (upholding Pure Bill of Discovery to allow plaintiff to secure medical testimony required by statute as a precedent to filing a medical malpractice suit). Since the Complaint in this action may be subsequently amended under Florida law to add substantive counts against NPC, without the need to file a new action, the action is removable now.

15.   Plaintiff alleges he has sustained substantial injuries, including liver cancer. *See* Complaint ¶¶ 8, 9, 10. Federal courts have ruled that the amount-in-

---

[2] *Stoller v. Nissan Motor Corp.*, 934 F. Supp. 423, 424 (S.D. Fla. 1996) is not to the contrary. In *Stoller*, the court found that it did not have removal jurisdiction over a Pure Bill of Discovery. However, in so holding the Court relied upon *Sunbeam Tel. Corp. v. Columbia Broadcasting System, Inc.*, 694 F. Supp. 889, 895 (S.D. Fla. 1988) for the proposition that "Florida has defined a **subsequent action for relief** based on the discovery as distinct from the pure bill of discovery." *Stoller* at 424 (emphasis added). The *Stoller* court further held: "Once this Bill is answered this proceeding terminates and if a subsequent suit for relief is filed it is a **separate proceeding entirely.**" *Id.* at 424 (emphasis added). The *Sunbeam* interpretation of Florida law is no longer valid. *See Surface v. Town of Bay Harbor Islands*, 625 So.2d 109 (Fla. Dist. Ct. App. 1993) (rejecting argument that Pure Bill of Discovery is a separate action and that it must be dismissed and a substantive complaint filed). *Perez* relied on *Surface* in reaching the result that it did, and, as such, is the proper federal interpretation of Florida law on a Bill of Discovery proceeding.

controversy threshold was met where plaintiffs have personal injuries allegedly caused by prescription medications, even where, as here, they do not expressly provide an amount in controversy.  *See, e.g., In re Rezulin Prods. Liab. Litig.,* 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (holding amount-in-controversy requirement satisfied in pharmaceutical products liability litigation alleging personal injury where "[t]he complaint … *does not preclude* recovery in excess of $75,000") (emphasis supplied).

16.     Seventy-five thousand dollars is much lower than the amounts that Florida juries routinely award plaintiffs who are able to prove liability and causation in product personal injury suits.

17.     The amendment of this action in the future to add substantive counts seeking damages against Novartis Pharmaceuticals Corporation is not speculative. Though the Complaint alleges discovery is needed to determine whether the drug in question "provides a legal basis to assert proximate cause of the child's liver cancer," the same counsel has already affirmatively pled in two separate proceedings that Elidel®, the drug at issue here, causes cancer.  Under Rule 11, Plaintiff's counsel must have already concluded that there is a good-faith basis to make identical claims.  *See* Weiss Second Amended Complaint ¶ 29 ("More specifically . . . Elidel® [has] been shown to carry a serious risk of cancer") (Exhibit D); Perry Second Amended Complaint ¶ 67 (Novartis failed to warn "of the actual risks associated with this drug, including the risk of potentially fatal malignancies, and the extent or actual risk thereof, notwithstanding the fact that the Novartis defendants, individually and collectively, knew that reasonable evidence of an association between the use of pimecrolimus [Elidel®] and such conditions existed.") (Exhibit E).

18.     Plaintiffs counsel, Larry Roth, holds himself out as being a national plaintiffs' lawyer pursuing Elidel® claims.  His website, www.elidellawyers.com,[3] is used to gather clients for lawsuits involving Novartis' drug Elidel® or Astellas Pharma's drug for the same indication, Protopic®.  In promotional materials, Roth claims that "the firm has been gathering information on topical immunosuppressant drugs [*i.e.,* Elidel® and Protopic®] for three years."  *See* Exhibit F.  Roth's firm asserts that "Hundreds of potential claimants have contacted our firm in the last year."  *Id.*

19.     NPC believes that the purpose of this action is to gather discovery for a short period of time prior to amending the complaint to bring substantive counts against NPC, precisely like those already brought in plaintiff's counsel's other two pending Elidel® cases.  NPC further believes that plaintiff's counsel may have brought this lawsuit without identifying an amount in controversy or Plaintiff's residence in an effort to hamper removal so that the case could move forward in Florida state court for one year – at which point removal to federal court would be impossible under 28 U.S.C. § 1446(b). Plaintiffs would then likely add the same substantive counts it has pled in the other two Elidel® cases.

WHEREFORE, Defendant respectfully removes this action from the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida to this Court pursuant to 28 U.S.C. § 1441.

---

[3] Roth owns elidellawyers.com and protopiclawyers.com; the first redirects to the second, which has information about Roth's activity against both drugs.

Dated: July 20, 2006

CARLTON FIELDS, P.A.
222 Lakeview Avenue, Suite 1400
West Palm Beach, FL 33401-6149
Email: ssutton@carltonfields.com
Telephone: (561) 659-7070
Facsimile:   (561) 659-7368

By: _____
    Stacey K. Sutton
    Florida Bar No. 0289530

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by U.S. mail, postage prepaid, this 20th day of July, 2006, upon:

Larry M. Roth, Esq.
Scott J. Liotta, Esq.
Law Offices of Larry M. Roth, PA
1615 Edgewater Dr, Ste. 180
Orlando, FL 32854-7637
*Counsel for Plaintiff*

_____
Stacey K. Sutton

# EXHIBIT "A"

07/12/2006 WED 11:54   FAX 973 781 2039                                    ☑003/040

## IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
## IN AND FOR PALM BEACH COUNTY FLORIDA

BRANDON BUTZBERGER, a minor, by                    )
and through his parent and natural guardian        )
DAVID BUTZBERGER,                                  )
                                                   )
                    Plaintiff                      )
                                                   )
v.                                                 )
                                                   )
NOVARTIS PHARMACEUTICALS CORPORATION,              )
a Delaware corporation doing business in Florida,  )
                                                   )
                    Defendant.                     )
                                                   )

ERIC LARSON
CERT. IN CIRCUIT COURT OF
2ND JUDICIAL CIRCUIT #063

---

### S U M M O N S

THE STATE OF FLORIDA:
To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this Summons, a copy of the Complaint, Interrogatories,
and Requests to Produce, in this action on Defendant:

    **NOVARTIS PHARMACEUTICALS CORPORATION**
    c/o Registered Agent
    Corporation Service Company
    1201 Hays Street
    Tallahassee, Florida 32301

    Each defendant is hereby required to serve written defenses to the complaint on LARRY M.
ROTH, ESQUIRE, THE LAW OFFICE OF LARRY M. ROTH, P.A., plaintiff's attorney, whose
address is 1615 Edgewater Drive, Suite 180, Post Office Box 547637, Orlando, Florida 32854,
within twenty (20) days after service of this summons on defendant, exclusive of the day of service,
and to file the original of the defenses with the Clerk of this Court either before service on plaintiff's
attorneys or immediately thereafter. If a defendant fails to do so, a default will be entered against
that defendant for the relief demanded in the complaint. Each defendant is also required to serve
responses to Interrogatories, and Requests to Produce, within forty-five (45) days after service.

    DATED on _____ JUN 2 0 2006 _____, 2006.

(COURT SEAL)        SHARON R. BOCK                           SHARON R. BOCK
                    Clerk & Comptroller                      the Circuit Court
                    P.O. Box 4667
                    West Palm Beach, Florida
                    33402-4667
                                                             ALICIA WA...

                    Page 1 of 2

                                                             11053

07/12/2006 WED 11:55   FAX 973 781 2039                                                             Ⓩ004/040

In accordance with the Americans With Disabilities Act, person with disabilities needing a special accommodation to participate in this proceeding should contact Court Administration at 37 North orange Avenue, Suite 1130, Orlando, Florida 32801, telephone (407) 836-2050, not later than seven (7) days prior to the proceeding. If hearing impaired, (TDD) 1-800-955-8771, or Voice (V) 1-800-955-8770, via Florida Relay Service.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero de caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff Attorney" (Demandante o Abogado del Demandante).

## IMPORTANTE

Des poursuites judicares ont ete entreprises contre vous.   Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe auprese de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes oblige de deposer votre reponse ecrite, avec mention de numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur de tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY FLORIDA

BRANDON BUTZBERGER, a minor, by
and through his parent and natural guardian
DAVID BUTZBERGER,

            Plaintiff

v.

NOVARTIS PHARMACEUTICALS CORPORATION,
a Delaware corporation doing business in Florida,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.:

## COMPLAINT FOR PURE BILL OF DISCOVERY

    Plaintiff, Brandon Butzberger, a minor, and David Butzberger, his parent and closest and best friend, hereby sues Defendant, Novartis Pharmaceuticals Corporation, and states as follows:

## JURISDICTION, VENUE AND PARTIES

1.    This is an action for discovery.

2.    This Court has jurisdiction over the matter in controversy, pursuant to its powers in equity.

3.    The Defendant, Novartis Pharmaceuticals Corporation ("Novartis") is a corporation incorporated under the laws of Delaware with its principal place of business located at 59 Route 10, East Hanover, New Jersey, 07936-1080.  Defendant is registered with the Florida Department of State, Division of Corporations and authorized to conduct business in Florida as a foreign for-profit

1



corporation.

4.      On or about October 2002, Plaintiff, Brandon Butzberger, a minor, visited his treating physician for the purposes of treating eczema on his body.

5.      At all times material to this action, David Butzberger, was and is the father and natural guardian of the minor Plaintiff.

6.      On or about October 30, 2002, the Plaintiff's treating dermatologist prescribed Elidel for Plaintiff to treat his symptoms.

7.      Elidel is a prescription drug for the treatment of eczema and atopic dermatitis. Said drug is designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendant, Novartis.

8.      Between October 2002 and October 2004, Defendant's product was applied extensively to Plaintiff's body, specifically on areas showing significant signs of redness particularly on his legs and thighs. Elidel was applied pursuant to the Defendant's guidelines and instructions every day twice a day until October 2004, at which time Plaintiff was diagnosed with cancer.   In January 2006, the FDA required a box warning on Elidel for, among other things, possible risk of cancer due to the use of the product.

9.      There are issues to be resolved and determined about Plaintiff's diagnosis of cancer being caused by his use of the Defendant's product being defective in that it causes cancer, and due to Novartis' negligent design, development, formulation, manufacture, testing, promotion, marketing, distribution, labeling, and/or selling the subject product.   However, Novartis publicly claims there is no link to cancer from this drug.  Pure Bill of Discovery Plaintiff suspects his liver

2

cancer herein is from the drug, but needs to determine, among other things, whether there is a cause of action and the potential responsible defendants. Also, because of a question of the timing of the use of the drug Elidel, the cancer diagnosis, and a running of the statute of limitations, the type of evidence sought by this Pure Bill of Discovery is necessary to make a timely decision on filing a products liability action against Novartis.

10.     Plaintiff's undersigned counsel, upon information and belief, has reason to believe that interrogatories, discovery and depositions taken under oath of various employees of Defendant, Novartis, and/or others will reveal evidence whether the product used for Plaintiff's eczema provides a legal basis to assert proximate cause of the child's liver cancer, which is necessary because of the information Novartis has and which is not otherwise available to the public generally, or this potential Plaintiff specifically.

11.     The great majority of the discovery sought by Plaintiff to determine whether or not Plaintiff has a basis for an action in negligence and/or strict liability and/or fraud is in the care, custody and complete control of the Defendant, Novartis.

12.     The Plaintiff is in need of an Order of this Court requiring Defendant, Novartis, to present its employees having knowledge of the formulation, design, development, manufacture, testing, inspection, packaging, safety, promotion, marketing, distribution, detailing and labeling of the suspect product for deposition, to respond to reasonable discovery, and to permit Plaintiff to set depositions of all who may have knowledge of the subject matter.

13.     Plaintiff anticipates filing a claim or claims against this Defendant and/or others for negligence, strict liability and fraud depending upon reasonable investigation of the matters

surrounding the minor Plaintiff's diagnosis of liver cancer, including who are proper parties and individuals subject to suit.

14.     Plaintiff has no way of acquiring and preserving the information sought by this Pure Bill of Discovery for use as evidence and for the development of additional evidence in the anticipated claims against said Defendant or others except by the relief sought herein.

15.     If the information sought herein is withheld from Plaintiff beyond applicable statutes of limitations, an irreparable injury may be sustained by Plaintiff.

WHEREFORE, Plaintiff requests that this Court enter an Order providing that Defendant, Novartis, respond to discovery under the Florida Rules of Civil Procedure served with the Complaint as might be on the subject matter of the events surrounding the minor Plaintiff's use of Elidel and subsequent diagnosis of liver cancer, and permitting depositions of Defendant's employees and others having knowledge of the design, development, manufacture, testing, inspection, packaging, safety, promotion, marketing, distribution, detailing and labeling of the suspect product.

RESPECTFULLY SUBMITTED this ___15th___ day of __June_____, 2006.

Larry M. Roth
Florida Bar No.: 208116
Scott J. Liotta
Florida Bar No.: 0037036
LAW OFFICES OF LARRY M. ROTH, P.A.
1615 Edgewater Drive
Suite 180
Orlando, FL 32854-7637
Telephone:   407-872-2239
Facsimile:   407-872-6927
Attorney for Plaintiff

4

Form 1.997.   CIVIL COVE₁ ₃HEET

The civil cover sheet and the information contained herein neither replace nor supplement the
filing and service of pleadings or other papers as required by law.  This form is required for the
use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida
Statute 25.075.  (See instructions on the reverse of the form.)

I.     CASE STYLE

(Name of Court) 15ᵗʰ Judicial Circuit Court, Palm Beach County

Plaintiff      Brandon Butzberger, a minor by and      Case #: _____
               through his parent and natural
               guardian David Butzberger              50   2006 CA U U 6 1 0 4 XXXX MB  AB

vs

Defendant      Novartis Pharmaceuticals Corporation, a Delaware corporation
               doing business in Florida.

II.    TYPE OF CASE     (Place an x in one box only.  If the case fits more than one type of
                         case, select the most definitive.)

| Domestic Relations | Torts | Other Civil |
|---|---|---|
| ☐ Simplified dissolution | ☐ Professional Malpractice | ☐ Contracts |
| ☐ Dissolution | ☐ Products liability | ☐ Condominium |
| ☐ Support–IV-D | ☐ Auto negligence | ☐ Real property/ Mortgage foreclosure |
| ☐ Support –Non IV-D | ☐ Other negligence | ☐ Eminent domain |
| ☐ URESA–IV-D | | ☒ Other |
| ☐ URESA–Non IV-D | | |
| ☐ Domestic violence | | |
| ☐ Other domestic relations | | |

III.   Is Jury Trial Demanded in Complaint?

☐ Yes
☒ No

DATE 6/15/06          SIGNATURE OF ATTORNEY FOR PARTY
                      INITIATING ACTION



INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET

**I. Case Style.** Enter the name of the court, the appropriate case number assigned at the time of filing of the original complaint or petition, the name of the judge assigned (if applicable), and the name (last, first, middle initial) of plaintiff(s) and defendant(s).

**II. Type of Case.** Plan an "x" in the appropriate box. If the cause fits more than one type of case, select the most definitive. Definitions of the cases are provided below.

(A) Simplified Dissolution of Marriage--petitions for the termination of marriage pursuant to Fla. Fam. L. R. P. 12.105.

(B) Dissolution of Marriage--petitions for the termination of marriage other than simplified dissolution.

(C) Support--IV-D--all matters relating to child or spousal support in which an application for assistance has been filed under Title IV-D, Social Security Act, except for such matters relating to dissolution of marriage petitions (sections 409.245, 409.2564, 409.2571 and 409.2597, Florida Statutes), paternity, or URESA.

(D) Support–Non IV-D--all matters relating to child or spousal support in which an application for assistance has not been filed under Title IV-D, Social Security Act.

(E) URESA–IV-D--all matters relating to Chapter 88, Florida Statutes, in which an application for assistance has been filed under Title IV-D, Social Security Act.

(F) URESA–Non IV-D--all matters relating to Chapter 88, Florida Statutes, in which an application for assistance has not been filed under Title IV-D, Social Security Act.

(G) Domestic Violence–all matters relating to injunctions for protection against domestic violence pursuant to section 741.30, Florida Statutes.

(H) Domestic Relations–all matters involving adoption, paternity, change of name, child custody, separate maintenance, annulment, or other matters not included in categories (A) through (G).

(I) Auto Negligence–all matters arising out of a party's allegedly negligent operation of a motor vehicle.

(J) Professional Malpractice–all professional malpractice lawsuits.

(K) Products Liability–all matters involving injury to person or property allegedly resulting from the manufacture or sale of a defective product or from a failure to warn.

(L) Other Negligence–all actions sounding in negligence, including statutory claims for relief on account of death or injury, not included in categories (G), (H), and (I).

(M) Condominium–all civil lawsuits pursuant to Chapter 718, Florida Statutes, where a condominium association is a party in the lawsuit.

(N) Eminent Domain–all matters relating to the taking of private property for public use, including inverse condemnation by state agencies, political subdivisions, and public service corporations.

(O) Real Property/Mortgage Foreclosure–all matters relating to the possession, title, and boundaries of real property. All matters involving foreclosures and sales, including foreclosures associated with condominium associations and condominium units.

(P) Contract and Indebtedness–all contract actions relating to promissory notes and other debts, including those arising from the sale of goods. Excludes contract disputes involving condominium associations.

(Q) Other Civil–all civil matters not included in categories (A) through (P).

**III. Is Jury Trial Demanded in Complaint?** Check the appropriate box to indicate whether a jury is being demanded in the complaint.

Date and attorney signature. Date and sign the civil cover sheet.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY FLORIDA

BRANDON BUTZBERGER, a minor, by            )
and through his parent and natural guardian )
DAVID BUTZBERGER,                           )
                                            )
                    Plaintiff               )
                                            )
v.                                          )
                                            )        Civil Action No.:
NOVARTIS PHARMACEUTICALS CORPORATION,       )
a Delaware corporation doing business in Florida, )
                                            )
                                            )
                    Defendant.              )
                                            )
_____     )

## NOTICE OF SERVICE OF INTERROGATORIES

**TO:   CLERK OF THE ABOVE-STYLED COURT**

    Notice is hereby given that the original and one copy of Plaintiff's Pure Bill of

Discovery Interrogatories to Defendant, NOVARTIS PHARMACEUTICALS

CORPORATION, have been served with the original Complaint for Pure Bill of

Discovery, and this original Notice filed with the Clerk of the Circuit Court pursuant to

Fla. R. Civ. P. 1.340.

    RESPECTFULLY SUBMITTED this _____15_____ day of __June__, 2006.



1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct original plus one (1) copy of the foregoing is being served with original process with the Complaint.

Larry M. Roth
Florida Bar No. 208116
Scott J. Liota
Florida Bar No. 0037036
E-mail: lroth@roth-law.com
LAW OFFICE OF LARRY M. ROTH, P.A.
1615 Edgewater Drive, Suite 180
Post Office Box 547637
Orlando, Florida  32854-7637
Telephone:   407 - 872-2239
Facsimile:   407 - 872-6927
Attorney for Plaintiff

2

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY FLORIDA**

BRANDON BUTZBERGER, a minor, by
and through his parent and natural guardian
DAVID BUTZBERGER,

          Plaintiff

v.

NOVARTIS PHARMACEUTICALS CORPORATION,
a Delaware corporation doing business in Florida,

          Defendant.

Civil Action No.:

2006 CA 006104 XXXX MB

FILED

## PLAINTIFF'S PURE BILL OF DISCOVERY FIRST REQUEST FOR PRODUCTION TO NOVARTIS PHARMACEUTICALS CORPORATION

The Plaintiff, BRANDON BUTZBERGER, by and through the undersigned counsel, pursuant to Fla. R. Civ. P. 1.350, hereby files this First Request for Production to the Defendant, Novartis Pharmaceuticals Corporation, and would hereby request the following documents, materials and things, in accordance with the following definitions and instructions:

### DEFINITIONS AND INSTRUCTIONS

1. "Document" shall be given the broadest meaning possible under the Florida Rules of Civil Procedure. "Document" means any written, recorded, or graphic material, whether prepared by you or by another person, that is in your possession, custody, or control, including memoranda, reports, letters, telegrams, electronic mail, other electronic form and any other communications or information recorded in any form or medium; notes, minutes, and transcripts of conferences, meetings and telephone or other communications; transparencies, view-graphs,



foils, slides, handouts, and multimedia presentations; contracts and other agreements; statements, ledgers, and other specifications; publications, photographs, diagrams, charts, and other drawings; photocopies, micro-file, microfiche, and other copies or reproductions; audio and video recordings; tape, disk (including all forms of magnetic, magneto-optical, laser, and optical disks), and other electronic recordings; financial models, statistical models and other data compilations; and computer printouts. The term includes all drafts of a document; the original document (or a copy thereof if the original is not available); and all copies that differ in any way from the original (including as to any notations, underlining, or other markings). The term also includes information stored in, or accessible through, computer or other information retrieval systems, together with instructions and all other materials necessary to use or interpret such data compilations.

2. "Tangible thing" or "tangible item" shall mean any physical object, physical evidence, laboratory exhibit, specimen, and the like.

3. "Related to", "referring to", "evidencing", regarding", and "which may evidence", are used in their broadest sense, and mean anything that, directly or indirectly, generally or specifically, regards, relates to, refers to, concerns, contains, constitutes, contradicts, evidences, embodies, compromises, reflects, mentions, identifies, states, deals with, comments on, responds to, describes, analyzes, or is in any way, directly or indirectly, relevant to the subject. NOTE: Any reference to documents or communication must include e-mails and any type of electronic transmission of information.

4. "Including" shall mean "including but not limited to".

5. "And" shall include "or" and "or" also shall include "and".

6. "Identify" or "identity" with respect to a document or tangible thing shall mean to set

forth the type of document or tangible thing (e.g. letter), its date of creation, author(s), recipients(s), title, if any, and subject matter. If a document is no longer in your possession, custody or control, so state and identify the document to the best of your knowledge and state what disposition was made of it, when and by whom.

7. "Identify" or "identity" with respect to a natural person shall mean to set forth his or her name, his or her business position and affiliation at the time in question, his or her last known business position and affiliation, and his or her last known business and home addresses, including telephone numbers. Once a person has been fully identified in your answer, such person may be identified thereafter by name alone.

8. "Communication" refers to any transfer of information, ideas, opinions or thoughts by any means, at any time or place, under any circumstances, and is not limited to written or verbal transfers between natural persons, but includes all other transfers, including electronic transfers, transfers of information stored on computer disk or computer memory, and memoranda to file.

9. "Detailmen" shall refer to any current and/or former employee of you, and/or any other entity who sold, marketed, promoted and/or introduced Elidel to medical and pharmaceutical professionals.

10. "Detail" or "Detailed" shall refer to the act of selling, marketing, promotion and/or introducing pharmaceuticals to medical and pharmaceutical professionals.

11. "Adverse event(s) (AE)" is defined as any undesirable experience occurring to a patient, person or individual who was prescribed Elidel, or given samples of Elidel, including any experience that resulted in death, was life threatening, required inpatient hospitalization or prolongation of existing hospitalization, resulted in persistent or significant disability/incapacity or congenital anomaly/birth defect, or was considered an important medical event.

12. As used herein the term "cancer" refers to Skin Cancer, Lymphoma, Liver Cancer, T-Cell Lymphoma, Squamous Cell Carcinoma, Non-Hodgkin's Lymphoma, Hodgkin's Lymphoma, Hepatoblastoma, Koposi's Sarcoma, Leukemia, Adrenal Blastoma, Multiple Myeloma, Rhabdomyosarcoma, Basal Cell Carcinoma, Melanoma, B-Cell Lymphoma, Wilms' Tumor, Malignant Neoplasm and Angiosarcoma.

13. Identify and state the subject matter of each document responsive to this request but not produced pursuant to a claim of privilege or a claim that the materials requested constitute non-discoverable trial preparation materials and specify why the documents is being withheld from production.

## DOCUMENTS REQUESTED

1. Copies of all lawsuit complaints, petitions for damages, or any legal document indicating action that has been taken by an injured person against you in the United States alleging cancer was a result of use of the product Elidel between the years 2001-present.

2. Copies of all lawsuit complaints, petitions for damages, or any legal document indicating action that has been taken by an injured person against you in every sales market where Elidel is authorized to be sold outside of the 50 United States, and U.S. Territories, between the years 2001-present, where someone alleged cancer as a result of the use of Elidel.

3. Copies of any claim letters received from any person, and any attorney representing an injured party who claimed cancer as a result of the use of Elidel between the years 2001-present.

4. Copies of all Phase IV clinical studies, research and cancer registries that you have maintained since approval of the NDA for Elidel.  This should include all cancer registry studies

preformed as part of your Phase IV commitments to the Food and Drug Administration.

5.   Copies of all Phase IV correspondence between you and the Food and Drug Administration.

6.   Copies of all notifications, writings, documents, consumer contacts, and any other form of notification to you by any individual who claimed to have been using Elidel post-marketing of the product by you who contented that they were diagnosed with any type of liver and hepatic cancer as a result of the use of Elidel between the years 2001-present.

7.   Copies of all post approval marketing studies performed by you dealing with the subject of cancer risk exposure to individuals using Elidel.

8.   Copies of any post NDA approval cancer registry documents maintained by you, without redactions, which contain information of Adverse Events (AE) by use of Elidel between the years 2001-present.

9.   Copies of all licensing agreements you have for the active ingredient pimecrolimus in Elidel with any other pharmaceutical, dermatological, or drug company.

10. Copies of all licensing agreements you have for the product Elidel with any other pharmaceutical, dermatological, or drug company.

11. Copies of the document retention policies of your company for the years 1996-present.

12. Copies of the Food and Drug Administration Approval Package/Summary Basis of Approval for all NDA, supplemental NDA and abbreviated NDA (ANDA) for Elidel.

13. Copies of the Annual Safety Reports from product approval date in 2000 to present for Elidel.

14. Copies of any special requested by any regulatory authorities related to safety for

Elidel.

15. Copies of all correspondence to and from the Food and Drug Administration concerning the Adverse Effects Reports (AERS) reports relating to Elidel for the years 2001-present.

16. Copies of all specific studies designed to test the ability of Elidel to cause lymphomas in persons using the product.

17. Copies of all specific studies designed to test the ability of Elidel to cause a cancer, including liver and hepatic risk in persons using the product.

18. Copies of all specific studies designed to test of blood, tissue and lymph node absorption of Elidel's active ingredient pimecrolimus by persons using the product.

19. Copies of all specific studies designed to test the potential of Elidel to cause any form of liver cancer, including hepatoblastoma, in persons using the product.

20. Copies of all correspondence to and from the Food and Drug Administration and any of its Advisory Committees during the years 2000-2005 concerning the causal relationship of Elidel and pimecrolimus to risk of cancer in users.

21. Copies of all correspondence to and from the Food and Drug Administration's Pediatric Advisory Committee during the period encompassing 2004-2005 concerning localized and systemic blood absorption of the active ingredient in Elidel, pimecrolimus, by users of the product, including animal studies.

22. Copies of all internal medical committee meeting minutes concerning the Adverse Events Reports (AERS) of cancer from Elidel, either foreign or domestic, including your responses, if any, for the period encompassing 2000-present.

23. Copies of all internal project management committee meeting minutes concerning the

Adverse Events Reports of cancer from Elidel, either foreign or domestic, including your responses, if any, for the period encompassing 2000-present.

24. Copies of internal special issues committee meeting minutes concerning the Adverse Events Reports of any form of liver cancer from the use of Elidel, either foreign or domestic, including your responses, if any, for the period encompassing 2000-present.

25. Copies of all internal medical risk management committee meeting minutes concerning the Adverse Events Reports of the use of Elidel, either foreign or domestic, including your responses, if any, for the period encompassing 2000-present.

26. Copies of all minutes and correspondence from any outside consulting source paid by you dealing with any Adverse Events of cancer reported during the years 2001-present.

27. Copies of all minutes and correspondence from any outside dermatology specialists paid by you dealing with the relationship between Elidel and Adverse Events of cancer reported during the years 2001-present.

28. Copies of all minutes and correspondence from any outside hematology specialists paid by you dealing with the relationship between Elidel and Adverse Events of cancer reported during the years 2001-present.

29. Copies of all minutes and correspondence from any outside oncology specialists paid by you dealing with the relationship between Elidel and Adverse Events of cancer reported during the years 2001-present.

30. Copies of all internal communications, including e-mails, relating to the issuance of the Food and Drug Administration's Pediatric Subcommittee of Anti-Infective Drug Advisory Committee studying recommendations for labeling changes to immunosuppressant atopical drugs, because of cancer risks of Elidel, which the advisory committee made in 2002.

31. Copies of internal communications, correspondence, including e-mails, during the period 2004-2005 relating to the Food and Drug Administration's consideration of an ultimate requirement that a black box cancer warning be place on the product Elidel.

32. Copies of all marketing strategies, business models, documents, plans and programs for the marketing, advertising and sale of Elidel for period encompassing 2000-present.

33. Copies of all marketing notebooks, product launch materials, including videos, programs, instructional materials, sample presentations, questions and answers and talking points, provided to your Elidel sales force employed by your company for the years 2001-present.

34. Copies of all marketing notebooks, programs, instructional materials, sample presentations, question and answers and talking points, provided to any independent contractor Elidel sales force employed by your company for the years 2001-present.

35. Copies of all documents and written material of any kind of Adverse Event Reports (AER) from any person using Elidel who claimed onset of any form of liver and any form of hepatic cancer as a consequence of using Elidel during the years 2001-present.

36. Copies of all customer contact sheets, notes, forms, and memoranda from your customer affairs and consumer affairs offices regarding any telephonic, written, electronic, or any other form of contact with customers using Elidel who were reporting cancer as any adverse event from using Elidel during the years 2001-present.

37. Provide your complete file for NDA 21-302.

38. Provide your Florida sales representatives and detail persons log books for all healthcare provider sales or detail calls for 2001-2004, including those to Dr. Diane Scott of Palm Beach.

39. Copies of all direct to consumer written materials, including brochures, pamphlets, catalogs or any other type of written document that was intended by you to be delivered or made available directly to the consumer concerning Elidel for the years 2001-present.

40. Please produce sample copies of all product pamphlets, product brochures and any other product written materials, concerning Elidel, provided to healthcare providers, physicians, pediatricians, and dermatologists in Florida during the years 2001-present which were intended to be distributed by the healthcare professionals to patients.

41. Copies of all correspondence to and from the American Academy of Dermatology during the years 2002-2005 concerning the Food and Drug Administration's proposal and ultimate decision to require a black box cancer warning on your product Elidel.

42. Copies of any documents, records, clinical studies, statistical analysis, evaluation reports, studies, and any other written materials associated with scientific tests with pimecrolimus performed with human patients by you during the years 1998-present that were not provided to the Food and Drug Administration.

43. Copies of any documents, records, clinical studies, statistical analysis, evaluation reports, studies, and any other written materials associated with scientific tests with pimecrolimus performed with human patients by you during the years 1998-present that was not made public or placed in the public domain in any way.

44. Copies of any documents, records, clinical studies, statistical analysis, evaluation reports, studies, and any other written materials associated with scientific tests performed with animal studies by you involving pimecrolimus during the years 1998-present that were not provided to the Food and Drug Administration.

45. Copies of any documents, records, clinical studies, statistical analysis, evaluation

reports, studies, and any other written materials associated with scientific tests performed with pimecrolimus in animal studies by you during the years 1998-present that was not made public or placed in the public domain in any way.

46. Copies of all correspondence and written materials between you and the Food and Drug Administration's Office of Drug Safety regarding Elidel causing liver and any form of hepatic cancer during the years 2001-present.

47. Please produce a sample box, product insert and tube of Elidel from all dosage levels.

48. Any and all studies, experiments, tests and analysis evaluating the systemic absorption of pimecrolimus into the blood stream by whatever criteria, including body surface area, conducted by you from 1998-present, including both human and animal studies.

49. Copies of all preclinical studies, clinical studies, animal studies, and carcinogenicity studies wherein you were evaluating, analyzing and/or experimenting with the use of pimecrolimus as an active ingredient for oral ingestion into the human system as a form of treatment of skin diseases.

50. Copies of all carcinogenicity studies relating to both humans and animals which you performed on a preclinical or clinical basis any time during the development of the drug Elidel with the active ingredient of pimecrolimus being used.

51. Copies of all evaluations, analysis, clinical studies and tests conducted by you or someone on your behalf to evaluate the absorption of pimecrolimus into the blood system during a human study.

52. Copies of all evaluations, analysis, clinical studies and tests conducted by you or someone on your behalf to evaluate pimecrolimus concentrations in whole blood after application of the product over a period of time during any animal study.

53. Copies of all evaluations, analysis, clinical studies and tests conducted by you or someone on your behalf to evaluate pimecrolimus concentrations in whole blood after application of the product of a period of time during any human study.

54. Copies of all documents, letters, internal memoranda, e-mails, policy manuals and other written documentation as to your course of action in response to the Food and Drug Administration's March 2005 requirement of a Black Box Warning for your product.

55. All documents, including log books and notes, that relate to, refer to, or discuss any and all sales representatives who detailed Elidel to Dr. Diane M. Scott, palm beach dermatology, inc., 470 Columbia Drive, #102, West Palm Beach, Florida 33409.

56. All documents which relate to, refer to and/or discuss the dates on which all individual(s) identified above detailed Elidel to Dr. Scott.

57. All documents which relate to, refer to, or discuss whether samples of Elidel were ever provided by you and/or any detailmen to Dr. Scott.

    (a)    All documents which relate to, refer to, discuss, and/or reflect how many samples of each strength of Elidel was provided to Dr. Scott by you and/or any detail persons.

    (b)    All documents which relate to, refer to, discuss and/or reflect the dates on which each strength of Elidel Samples were provided to Dr. Scott by you and/or any detail persons.

58. All documents relating to, referring to or embodying the various pathways of distribution of Elidel to consumers within the United States, including, but not limited to, documents which reference any distributors, sales representatives and/or retailers of Elidel, for the period encompassing 2001-present.

59. All documents detailing, relating to, referring to and/or cataloguing the way in which

you distributed Elidel products to retailers within the State of Florida for the period encompassing 2001-present.

60. Please produce all documents which reference, relate to, or reflect the distribution of the various lot numbers of Elidel to distributors and/or retailers within the State of Florida for the period encompassing 2001-present.

61. Please produce all documents relating to, referring to or embodying any correspondence, communications, contracts or other discussions of any kind between Defendant, its agents or any party acting on Defendant's behalf, and any other drug company concerning the risk or occurrence of cancer, hepatic cancer and/or hepatoblastoma from the use of Elidel.

62. All documents relating to, referring to or embodying any pre-clinical studies or testing of Elidel to assess the risk or occurrence of cancer, hepatic cancer and/or hepatoblastoma from the use of Elidel, including but not limited to, test protocols, data compilations, laboratory notebooks, summaries of results, drafts of reports, interim reports, final reports, published articles, financial remuneration, engagement of consultants/investigators, internal memoranda and submissions of data to the FDA or any Foreign Government Regulatory Authority.

63. All documents relating to, referring to or embodying any epidemiology studies assessing the risk or occurrence of cancer, hepatic cancer and/or from the use of Elidel, including but not limited to, test protocols, data compilations, summaries of results, drafts of reports, interim reports, final reports, published articles, financial remuneration, engagement of investigators, internal memoranda and submissions of data to the FDA or any Foreign Government Regulatory Authority.

64. Please produce all documents relating, referring to or embodying any codes of conduct or ethical standards with respect to the marketing or labeling of drug products that were

promulgated or adopted by any trade organization of which Defendant was a member of from 2001-present.

65. All tissue samples or tissue preserved slides for analysis from all animal Pharmacology/Toxicology studies you conducted in support of both the IND and NDA for Elidel.

66. All tissue slides or samples taken from any patient involved in your Phase III clinical trials, regardless of whether or not the patient completed the full term of the trial.

67. All laboratory test results, including blood samples, slides and viles of blood from all patients participating in Elidel Phase III clinical studies and trials regardless of whether or not the patient completed the full term of the trial.

68. Copies of all correspondence, electronic transmissions, facsimiles, telex, telegrams, and any other written documentation of any form, regardless of its hard copy or electronic format, between Novartis Pharmaceuticals Corporation, Novartis Pharma AG, and Novartis International AG, from the date of the filing of the IND for Elidel to present which involved the active ingredient pimecrolimus, and any risk pimecrolimus can cause any form of liver cancer.

69. All documents relating to, referring to or reflecting the efficacy and safety study of pimecrolimus cream 1% in patients 3 months of age and above with mild to moderate atopic dermatitis, which was commenced in December 2004 by you in the Philippines.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this Request for Production is being served on Novartis Pharmaceutical Corporation's Registered Agent in Florida with the original service of process of the Complaint for Pure Bill of Discovery.

**Larry M. Roth**
**Florida Bar No.:  208116**
**Scott J. Liotta**
**Florida Bar No.: 0037036**
**LAW OFFICES OF LARRY M. ROTH, P.A.**
**1615 Edgewater Drive**
**Suite 180**
**Orlando, FL 32854-7637**
**Telephone:   407-872-2239**
**Facsimile:   407-872-6927**
**Attorney for Plaintiff**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY FLORIDA

BRANDON BUTZBERGER, a minor, by )
and through his parent and natural guardian )
DAVID BUTZBERGER, )
)
        Plaintiff )
)
v. )
)    Civil Action No.
)    50-2006-CA-6164-MB-AB
NOVARTIS PHARMACEUTICALS CORPORATION, )
a Delaware corporation doing business in Florida, )
)
        Defendant. )
_____ )

## ORDER SETTING HEARING

A hearing has been scheduled for **Friday, August 25, 2006, at 8:00 a.m.** for thirty

minutes before the undersigned Judge on the Complaint for Pure Bill of Discovery filed on June

20, 2006.

**The parties cannot cancel this specially set hearing without Court approval.**

**DONE AND ORDERED** in Chambers in Palm Beach County, West Palm Beach,

Florida, this 5th day of ____July____, 2006.

_____
JONATHAN D. GERBER
CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Order Setting Hearing has been
furnished this ___ day of _____, 2006, by U.S. Mail to: Scott J. Liotta, Esquire, Law
Offices of Larry M. Roth, P.A., P. O. Box 547637, Orlando, FL 32854-7637; and to Novartis
Pharmaceuticals Corporation, c/o Registered Agent, Corporation Service Company, 1201 Hays
Street, Tallahassee, FL 32301.

_____
Judicial Assistant



IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY FLORIDA

BRANDON BUTZBERGER, a minor, by          )
and through his parent and natural guardian  )
DAVID BUTZBERGER,                        )
                                         )
                    Plaintiff            )
                                         )
v.                                       )
                                         )          Civil Action No.
NOVARTIS PHARMACEUTICALS CORPORATION,    )          50-2006-CA-6104-MB-AB
a Delaware corporation doing business in Florida,  )
                                         )
                                         )
                    Defendant.           )
_____)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR PURE BILL OF DISCOVERY

"Pure bills for discovery have so long been an acknowledged subject of equity jurisdiction that statutes purporting to give other and simpler means of obtaining that identical relief are not regarding as ousting the equity jurisdiction, at least in the absence of some clear legislative declaration to that effect." Hernandez Perez v. Citibank, N.A. 328 F. Supp. 2d 1374, 1376-77 (S.D. Fla. 2004)(quoting First National Bank of Miami v. Dade-Broward Co., 125 Fla. 594, 596, 171 So. 519, 511 (Fla. 1936)).   This action in equity is "brought to obtain the disclosure of facts within the defendant[s'] knowledge, [and] writings in [their] custody, in aid of the prosecution...about to be commenced in some other court." Campbell v. Knight, 109 So. 577 (Fla. 1926).

The facts set forth in Plaintiffs' Complaint meet the test for sufficiency of a pure bill of discovery. See First National Bank of Miami v. Dade-Broward Co, supra.  The complaint should



CLERK:
File this document
in the court file.
Judge Gerber

set forth: "1) the matters concerning which the discovery asked for is sought; 2) the interests of the several parties in the subject of the inquiry; 3) the complainant's right to have the relief prayed; 4) the complainant's title and interest, and what relationship of same is to the discovery sought claimed; and 5) discovery so attempted is material to litigation brought on the common law side of the court so as to entitle the complainant to a disclosure of what is necessary to maintain its own claim in that litigation."[1]

The discovery sought herein is relevant and critical to at least six potential claims: a) an action for negligence against Novartis Pharmaceuticals Corporation ("Novartis") and/or others; b) an action for Negligent Failure to Warn against Novartis and/or others; c) an action for Fraud and Misrepresentation against Novartis and/or others; d) an action for Strict Products Liability for Defective Products against Novartis and/or others; e) an action for Strict Products Liability Failure to Warn as against Novartis and/or others; and f) an action for Conspiracy against Novartis and/or others.

The records and information requested are in exclusive possession and control of the defendants and are material to the Plaintiff's prospective lawsuit.  Production is necessary to ascertain who may be sued and under what theories.  Without the requested discovery, plaintiff will be limited to filing a lawsuit based only upon information and belief.  If this court grants the pure bill of discovery in this case and the discovery produced indicates that a lawsuit would be groundless or frivolous, this would serve "the court['s] interest as well as the parties' best interests and advantage." Adventist Health System/Sunbelt, Inc. v. Hegwood, 569 So.2d 1295, 1297 (Fla. 5th DCA 1990).  The seriousness of the proffered facts requires the pre-suit disclosure of this discovery.

---

[1] The Complaint for a Pure Bill of Discovery *A Living, Breathing Modern Day Dinosaur?*, 78 Fla. Bar J. 50, 51 (March 2004).

Plaintiff has no way of acquiring and preserving the information sought by this Pure Bill of Discovery for use as evidence and for the development of additional evidence in the anticipated claims against said Defendant or others except by the relief sought herein.

If the information sought herein is withheld from Plaintiff beyond applicable statutes of limitations, an irreparable injury may be sustained by Plaintiff.

WHEREFORE, Plaintiff requests that this Court enter an Order providing that Defendant, Novartis, respond to discovery under the Florida Rules of Civil Procedure served with the Complaint as might be on the subject matter of the events surrounding the minor Plaintiff's use of Elidel and subsequent diagnosis of liver cancer, and permitting depositions of Defendant's employees and others having knowledge of the design, development, manufacture, testing, inspection, packaging, safety, promotion, marketing, distribution, detailing and labeling of the suspect product.

RESPECTFULLY SUBMITTED this _27th_ day of _June_, 2006.

Larry M. Roth
**Florida Bar No.: 208116**
**Scott J. Liotta**
**Florida Bar No.: 0037036**
**LAW OFFICES OF LARRY M. ROTH, P.A.**
**1615 Edgewater Drive, Suite 180**
**Orlando, FL 32854-7637**
**Telephone: 407-872-2239**
**Facsimile: 407-872-6927**
**Attorneys for Plaintiff**

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing Memorandum in Support of Plaintiffs' Complaint for Pure Bill of Discovery has been furnished this 27th day of June, 2006, by mail to Novartis Pharmaceuticals Corporation, c/o Registered Agent, Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

_____
Scott J. Liotta

# EXHIBIT "B"

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA**

BRANDON BUTZBERGER, a minor, by
and through his parent and natural guardian
DAVID BUTZBERGER,

                Plaintiff             Case No.: 502006CA006104XXXXMB (AB)

v.

NOVARTIS PHARMACEUTICALS
CORPORATION, a Delaware corporation,

                Defendant.
_____/

## NOTICE TO STATE COURT OF REMOVAL

Please take notice that the undersigned, on behalf of Defendant NOVARTIS

PHARMACEUTICALS CORPORATION, has filed the attached Notice of Removal,

without attachments, in the United States District Court for the Southern District of Florida,

to remove the above-entitled action from the Circuit Court of the Fifteenth Judicial Circuit in

and for Palm Beach County, Florida to said United States District Court.

        Dated: July 20, 2006

                    CARLTON FIELDS, P.A.
                    222 Lakeview Avenue, Suite 1400
                    West Palm Beach, FL 33401-6149
                    Email:  ssutton@carltonfields.com
                    Telephone:  (561) 659-7070
                    Facsimile:   (561) 659-7368

                    By: _____
                        Stacey K. Sutton
                        Florida Bar No. 0289530

                    *Attorneys for Defendant*
                    *Novartis Pharmaceuticals Corporation*

*Butzberger v. Novartis Pharmaceuticals Corp.*
Case No.  50-2006-CA-6104-MB-AB

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by U.S. mail, postage

prepaid, this 20th day of July, 2006, upon:

Larry M. Roth, Esq.
Scott J. Liotta, Esq.
Law Offices of Larry M. Roth, PA
1615 Edgewater Dr, Ste. 180
Orlando, FL  32854-7637
***Counsel for Plaintiff***

Stacey R. Sutton

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

BRANDON BUTZBERGER, a minor, by
and through his parent and natural guardian
DAVID BUTZBERGER,

                    Plaintiff

v.

NOVARTIS PHARMACEUTICALS
CORPORATION, a Delaware corporation,

                    Defendant.

_____/

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant Novartis Pharmaceuticals Corporation ("NPC" or "Defendant"), by and through its undersigned counsel, hereby gives notice that it is removing the above-captioned matter from the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, Case No. 502006CA006104XXXXMB (AB), to the United States District Court for the Southern District of Florida. The grounds for removal are set forth below.

### STATE COURT ACTION

1.     On or about June 20, 2006, Plaintiff commenced a civil action by filing a complaint, couched as a Bill of Discovery, (the "Complaint") against NPC in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, as Case No. 502006CA006104XXXXMB (AB) (the "State Court Action"). NPC was served

with the summons and Complaint in the State Court Action on June 30, 2006. A copy of

the Summons and Complaint served on NPC is attached within Composite Exhibit A[1].

> 2.    NPC has not answered the Complaint.

> 3.    As more fully set forth below, this case is properly removed to this Court

pursuant to 28 U.S.C. § 1441. Defendant has satisfied the procedural requirements for

removal, and this Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1441(a).

## THE PARTIES

> 4.    Upon information and belief, Plaintiff is a resident of Palm Beach County,

Florida.

> 5.    As set forth in the Complaint, NPC is a Delaware corporation with its

principal place of business in East Hanover, New Jersey.

## AUTHORITY FOR REMOVAL

**I.    NPC Has Satisfied the Procedural Requirements for Removal**

> 6.    Removal is timely. NPC was served with a copy of the Complaint on June

30, 2006. *See* Exhibit A (copy of all process, pleadings, and orders served upon NPC,

including the summons and complaint). This Notice of Removal is being filed within 30

days of the first date on which NPC received a copy of the Complaint through service,

and so is timely pursuant to 28 U.S.C. § 1446(b).

> 7.    Venue is proper. The Circuit Court of the Fifteenth Judicial Circuit in and

for Palm Beach County, Florida is located within the Southern District of Florida, and,

therefore, venue is proper in this Court pursuant to 28 U.S.C. § 115(a)(2) because it is

---

[1] No proof of service has been filed in the State Court Action reflecting service of the Complaint on NPC. However, in the interest of expediency and for purposes of removal, NPC will concede that it was served with the Complaint on June 30, 2006.

"the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).

      8.    No further proceedings have been had in the State Court Action.

      9.    No previous application has been made for the relief requested herein.

      10.    A copy of the written notice required by 28 U.S.C. § 1446(d) is attached as Exhibit B and is being filed in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida and served on Plaintiff.

## II.    <u>Removal is Proper in This Case</u>

      11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of costs and interest.

### A.    **Complete diversity exists between Plaintiff and Defendant.**

      12.    The Complaint does not set forth the state or county of residence of the plaintiff.  However, for venue to be proper in the court in which the Complaint was filed, the plaintiff would have to be a resident of Palm Beach County.  Furthermore, on information and belief, the plaintiff is, in fact, a resident of and citizen of Palm Beach County, Florida.  *See* Asset Search identifying David Butzberger as living in West Palm Beach, Florida, attached as Exhibit C.

      13.    NPC is, and has been at all relevant times, a corporation incorporated under the laws of the State of Delaware, *see* Compl. ¶ 2, with its principal place of business in the State of New Jersey.  For purposes of determining jurisdiction pursuant to 28 U.S.C § 1332(c)(1), therefore, NPC is not a citizen of the state of Florida.

**B.      The amount in controversy requirement is satisfied.**

14.      The complaint is titled a "Complaint For Pure Bill of Discovery," and fails to provide an explicit amount in controversy.  However, this does not preclude removal. Under Florida law, there is "one form of pleading," and a Complaint For Pure Bill of Discovery may freely be amended to add substantive counts against the defendant.  *See Perez v. Citibank*, 328 F. Supp. 2d 1374, 1377-78 (S.D. Fla. 2004) (upholding removal of a Pure Bill of Discovery to federal court in part due to the fact that it can be amended to add substantive causes of action).[2]  A Complaint For Pure Bill of Discovery is employed to gather additional information allegedly needed to bring substantive counts.  *See, e.g., Adventist Health System/Sunbelt Inc. v. Hegwood*, 569 So.2d 1295 (Fl. Dist. Ct. App. 1990) (upholding Pure Bill of Discovery to allow plaintiff to secure medical testimony required by statute as a precedent to filing a medical malpractice suit).  Since the Complaint in this action may be subsequently amended under Florida law to add substantive counts against NPC, without the need to file a new action, the action is removable now.

15.      Plaintiff alleges he has sustained substantial injuries, including liver cancer.  *See* Complaint ¶¶ 8, 9, 10.  Federal courts have ruled that the amount-in-

---

[2] *Stoller v. Nissan Motor Corp.*, 934 F. Supp. 423, 424 (S.D. Fla. 1996) is not to the contrary.  In *Stoller*, the court found that it did not have removal jurisdiction over a Pure Bill of Discovery. However, in so holding the Court relied upon *Sunbeam Tel. Corp. v. Columbia Broadcasting System, Inc.*, 694 F. Supp. 889, 895 (S.D. Fla. 1988) for the proposition that "Florida has defined **a subsequent action for relief** based on the discovery as distinct from the pure bill of discovery." *Stoller* at 424 (emphasis added).  The *Stoller* court further held: "Once this Bill is answered this proceeding terminates and if a subsequent suit for relief is filed it is a **separate proceeding entirely.**" *Id.* at 424 (emphasis added).  The *Sunbeam* interpretation of Florida law is no longer valid. *See Surface v. Town of Bay Harbor Islands*, 625 So.2d 109 (Fla. Dist. Ct. App. 1993) (rejecting argument that Pure Bill of Discovery is a separate action and that it must be dismissed and a substantive complaint filed). *Perez* relied on *Surface* in reaching the result that it did, and, as such, is the proper federal interpretation of Florida law on a Bill of Discovery proceeding.

controversy threshold was met where plaintiffs have personal injuries allegedly caused by prescription medications, even where, as here, they do not expressly provide an amount in controversy. *See, e.g., In re Rezulin Prods. Liab. Litig.,* 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (holding amount-in-controversy requirement satisfied in pharmaceutical products liability litigation alleging personal injury where "[t]he complaint ... *does not preclude* recovery in excess of $75,000") (emphasis supplied).

16.   Seventy-five thousand dollars is much lower than the amounts that Florida juries routinely award plaintiffs who are able to prove liability and causation in product personal injury suits.

17.   The amendment of this action in the future to add substantive counts seeking damages against Novartis Pharmaceuticals Corporation is not speculative. Though the Complaint alleges discovery is needed to determine whether the drug in question "provides a legal basis to assert proximate cause of the child's liver cancer," the same counsel has already affirmatively pled in two separate proceedings that Elidel®, the drug at issue here, causes cancer.  Under Rule 11, Plaintiff's counsel must have already concluded that there is a good-faith basis to make identical claims.  *See* Weiss Second Amended Complaint ¶ 29 ("More specifically . . . Elidel® [has] been shown to carry a serious risk of cancer") (Exhibit D); Perry Second Amended Complaint ¶ 67 (Novartis failed to warn "of the actual risks associated with this drug, including the risk of potentially fatal malignancies, and the extent or actual risk thereof, notwithstanding the fact that the Novartis defendants, individually and collectively, knew that reasonable evidence of an association between the use of pimecrolimus [Elidel®] and such conditions existed.") (Exhibit E).

18.     Plaintiffs counsel, Larry Roth, holds himself out as being a national plaintiffs' lawyer pursuing Elidel® claims. His website, www.elidellawyers.com,[3] is used to gather clients for lawsuits involving Novartis' drug Elidel® or Astellas Pharma's drug for the same indication, Protopic®. In promotional materials, Roth claims that "the firm has been gathering information on topical immunosuppressant drugs [*i.e.,* Elidel® and Protopic®] for three years." *See* Exhibit F. Roth's firm asserts that "Hundreds of potential claimants have contacted our firm in the last year." *Id.*

19.     NPC believes that the purpose of this action is to gather discovery for a short period of time prior to amending the complaint to bring substantive counts against NPC, precisely like those already brought in plaintiff's counsel's other two pending Elidel® cases. NPC further believes that plaintiff's counsel may have brought this lawsuit without identifying an amount in controversy or Plaintiff's residence in an effort to hamper removal so that the case could move forward in Florida state court for one year – at which point removal to federal court would be impossible under 28 U.S.C. § 1446(b). Plaintiffs would then likely add the same substantive counts it has pled in the other two Elidel® cases.

WHEREFORE, Defendant respectfully removes this action from the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida to this Court pursuant to 28 U.S.C. § 1441.

---

[3] Roth owns elidellawyers.com and protopiclawyers.com; the first redirects to the second, which has information about Roth's activity against both drugs.

Dated: July 20, 2006

CARLTON FIELDS, P.A.
222 Lakeview Avenue, Suite 1400
West Palm Beach, FL  33401-6149
Email:  ssutton@carltonfields.com
Telephone:  (561) 659-7070
Facsimile:   (561) 659-7368

By: _____
Stacey K. Sutton
Florida Bar No. 0289530

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by U.S. mail, postage

prepaid, this 20th day of July, 2006, upon:

Larry M. Roth, Esq.
Scott J. Liotta, Esq.
Law Offices of Larry M. Roth, PA
1615 Edgewater Dr, Ste. 180
Orlando, FL  32854-7637
*Counsel for Plaintiff*

_____
Stacey K. Sutton

# EXHIBIT "C"

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-FIND

**Name:** BUTZBERGER, DAVE L (MALE)

**Additional Names:**
   BUTZBERGER, LUISA C (FEMALE), 8/1966

**Consumer Name Last Updated:** 3/8/2002

**Address:**
   402 MAPLEWOOD DR APT 4
   WEST PALM BEACH, FL 33415-1462

**Birthdate:** 6/1964

**Telephone:** (561) 615-4469

**Date Vendor Record Last Updated:** 1/26/2006

4 of 100 DOCUMENTS

*** THIS DATA IS FOR INFORMATION PURPOSES ONLY ***

PROPERTY RECORD FOR PALM BEACH COUNTY, FL

ESTIMATED ROLL CERTIFICATION DATE JULY 1, 2004

**Owner:** BUTZBERGER DAVID L; Owner Occupied

**Mailing Address:** 402 MAPLEWOOD DR, WEST PALM BEACH, FL 33415-1462

**Property Address:** 402 MAPLEWOOD DR, WEST PALM BEACH, FL 33415-1462

**************************** SALES INFORMATION ****************************

**Recorded Date:** 08/1998

**Sale Price:** $ 76,000 (Full Amount)

**Book/Page:** 10680/1147

**Prior Sales Date:** 10/1992

**Prior Sales Price:** $ 75,100 (Full Amount)

**Document Type:** WARRANTY DEED

**************************** ASSESSMENT INFORMATION ****************************

**Assessor's Parcel Number:** 18-42-44-10-05-004-0012

**Legal Description:** CITY: GREENACRES; SUBDIVISION: JOGGERS RUN THS; SEC/TWN/RNG/MERIDIAN: SEC 10 TWN 44S RNG 42E

Brief Description: JOGGERS RUN S 11.1 FT OF E .50 FT OF LT 1 & LT 2 (LESS N 23 FT OF W 2.17FT) BLK 4

**Market Value Year:** 2004

**Market Improvement Value:** $ 120,000

**Total Market Value:** $ 120,000

**Land Use:** TOWNHOUSE

**Assessment Year:** 2004

**Total Assessed Value:** $ 68,793

**************************** TAX INFORMATION ****************************

**Tax Rate Code:** 18986

Page 2

PALM BEACH COUNTY, FL 402 MAPLEWOOD DR, WEST PALM BEACH, FL 33415-1462

**Tax Amount:** $ 551.05

**Tax Year:** 2004

**Exemption:** HOMESTEAD

************************ **PROPERTY CHARACTERISTICS** ************************

| | | | |
|---|---|---|---|
| Year Built: | 1990 | No. of Buildings: | |
| Stories: | 1 | Style: | |
| Units: | | Air Conditioning: | |
| Bedrooms: | 3 | Heating: | |
| Baths: | 2.50 | Construction: | |
| Partial Baths: | | Basement: | |
| Total Rooms: | | Exterior Walls: | |
| Fireplace: | | Foundation: | |
| Garage Type: | Garage | Roof: | |
| Garage Size: | 1 Car(s) | Elevator: | |
| Pool/Spa: | | Lot Size: | 1307 SF |
| | | Building Area: | 1560 |

**TAPE PRODUCED BY COUNTY:** 12/2004

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

PHILIP C. WEISS, *et al.*,                  )
                                            )
                    Plaintiffs,             )
                                            )
v.                                          )         Civil Action No.:5:05CV-527-JMH
                                            )
ASTELLAS PHARMA, US, INC.,                  )         Electronically Filed
*et al.*,                                   )
                                            )
                    Defendants.             )
_____ )

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

     Plaintiffs, Philip C. Weiss and Cassandra Weiss, by and through counsel, and for their

Second Amended Complaint against the Defendants, state:

**COMMON ALLEGATIONS AS TO COUNTS**

     1.    Plaintiff, Philip C. Weiss, is a resident and citizen of Versailles, Woodford

County, Kentucky.

     2.    Plaintiff, Cassandra Weiss, is a resident and a citizen of Versailles, Woodford

County, Kentucky, and the spouse of Plaintiff, Philip C. Weiss.

     3.    Defendant, Astellas Pharma US, Inc. ("APUS"), is a foreign corporation, doing

business in Kentucky.

     4.    Defendant, Astellas Pharma Inc. ("API"), is a Japanese corporation, doing business in

Kentucky and will be served with process through the Hague Convention on Service of Process

Abroad on Judicial and Extra-Judicial Documents in Civil and Commercial Matter.

     5.    Upon information and belief, API is a successor corporation to Fujisawa

1

Pharmaceutical Co., Ltd., as a result of a merger with Yamanouchi Pharmaceutical Co., Ltd. on April 1, 2005. In particular, following this merger Yamanouchi remained as a legal entity. However, upon information and belief, Yamanouchi then changed its name to Astellas Pharma, Inc. As a result of this merger, Fujisawa Pharmaceutical Co., Ltd. ceased to exist as a legal entity. API, as the successor corporation, assumed all assets and liabilities, and obtained control and possession of all documents, materials, patents, formulas, trademarks, service marks, intellectual property, and all commercial, scientific and medical documents formerly held by the predecessor corporation Fujisawa. Any liability on the part of Fujisawa for the design, formulation, manufacture, marketing, distribution and sale of Protopic has become the legal obligation of API.

6.      Upon information and belief, APUS was formed following the merger identified in paragraph 5, and APUS is a successor corporation to Fujisawa Healthcare, Inc. ("FHI"). As a result of this merger, FHI ceased to exist as a legal entity. APUS, as the successor corporation, assumed all assets and liabilities, and obtained control and possession of all documents, materials, patents, trademarks, formulas, service marks, intellectual property, and all commercial, scientific and medical documents formerly held by the predecessor corporation FHI. Any liability on the part of FHI for the design, formulation, manufacture, marketing, distribution and sale of Protopic has become the legal obligation of APUS.

7.      APUS and API have substantial contacts and a presence in Kentucky, including, but limited to the fact that its employees, agents, sales representatives, and/or independent contractors are citizens within Kentucky who are paid by APUS and API to act on their behalf, and who have power and authority to legally bind and obligate one or both companies to contracts and to the laws of Kentucky.

2

8.      At all material times hereto, APUS and API designed, tested, fabricated, formulated, manufactured, distributed, marketed, and sold a product know as Protopic in Kentucky for purposes of treating various skin diseases.

9.      Pursuant to KRS 454.210, both APUS and API are subject to personal jurisdiction in Kentucky.  APUS and API designed, manufactured, formulated, prepared, tested, processed, distributed, marketed and sold Protopic with the expectation that said product would be distributed, sold, marketed, prescribed and used in Kentucky.  In addition, APUS and API had the expectation that Protopic would in fact be distributed, marketed, sold, prescribed and ultimately used by consumers in Kentucky.  As a result, APUS and API derived substantial income, revenue and profits from Protopic sales within Kentucky.

10.     APUS and API are subject to jurisdiction in Kentucky pursuant to KRS 454.210 in that APUS and API committed tortious acts within the State.  APUS and API are further subject to jurisdiction in Kentucky based upon, but not limited to, transactions occurring outside Kentucky but injuring Plaintiffs within Kentucky.  Further, APUS and API engaged in or solicited business within Kentucky from which they derived substantial revenue from Protopic being sold, prescribed and used in Kentucky.

11.     APUS is but an alter ego of API.  All financial decisions, decisions on drugs and research, and marketing of Protopic by APUS was controlled and regulated by API.  These corporations have common and interlocking boards of directors and officers.  Further, on a regular basis API sends its employees to APUS to work in all facets of APUS business, and then after a set number of years these employees return to API.

12.     In or about 2000 APUS, or its predecessor corporation, received Food and Drug

3

Administration ("FDA") approval of Protopic for the treatment of atopic dermatitis. The product had limited prescribing restrictions for its use and application including, for example, that it should not be used or prescribed for long term use, and be used as a second-line therapy only after first-line treatments with steroids were ineffective or could not be used.

13.     The product, Protopic, with its active ingredient tacrolimus, was and is a substantial and contributing cause in the development of cancer, lymphadenopathy, lymphomas, serious upper respiratory diseases and other injuries, harms and damages suffered by Philip Weiss who used and applied the product in accordance with the manufacturer's directions. As a result of its inherent dangers, Protopic is defective by design, formulation, manufacture, distribution and sale. Furthermore, APUS and API all failed to adequately warn of cancer risks associated with Protopic to Philip Weiss and/or to his physician, Dr. Joseph Bark.

14.     Defendant, Novartis Pharmaceuticals Corporation ("NPC"), is a foreign corporation doing business in Kentucky.

15.     Defendant, Novartis AG ("Swiss Novartis"), is a Swiss corporation doing business in Kentucky, and will be served with process through the Hague Convention on Service of Process Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters.

16.     Defendant, Novartis Pharma GmbH ("Novartis Germany"), is a German corporation doing business in Kentucky, and will be served with process through the Hague Convention on Service of Process Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters.

17.     NPC, Swiss Novartis and Novartis Germany have substantial contacts and a presence in Kentucky including, but not limited to the fact that its employees, agents, sales representatives

4

and/or independent contractors are citizens within Kentucky who are paid by NPC, Swiss Novartis, and Novartis German to act on their behalf, and who have power and authority to legally bind and obligate any one or all three companies to contracts and the laws of Kentucky.

18.     At all material times hereto, NPC, Swiss Novartis and Novartis Germany designed, tested fabricated, formulates, processed, manufactured, distributed, marketed and sold a product known as Elidel in Kentucky for purposes of treating various skin diseases.

19.     Pursuant to KRS 454.210, NPC, Swiss Novartis and Novartis Germany are subject to personal jurisdiction in Kentucky.  NPC, Swiss Novartis and Novartis Germany designed, manufactured, formulated, prepared, tested, processed, distributed, marketed and sold Elidel with the expectation that said product would be distributed, sold, marketed, prescribed and used in Kentucky. In addition, they had the expectation that Elidel would in fact be distributed, marketed, sold, prescribed and ultimately used by consumers in Kentucky.  As a result, NPC, Swiss Novartis and Novartis Germany have derived substantial income, revenue, and profits from Elidel sales within Kentucky.

20.     NPC is but an alter ego of Swiss Novartis and Novartis Germany.  All financial decisions, decisions on drugs and research, and marketing of Elidel by NPC was controlled and regulated by Swiss Novartis and Novartis Germany.  These corporations have common and interlocking boards of directors and officers.  Further, on a regular basis, Swiss Novartis and Novartis Germany sends its employees to NPC to work in all facets of NPC's business, and then after a set number of years these employee return to either Swiss Novartis or Novartis Germany.

21.     NPC, Swiss Novartis and Novartis Germany are subject to the jurisdiction of Kentucky pursuant to KRS 454.210 in that these defendants committed tortious acts within the State.

5

NPC, Swiss Novartis and Novartis Germany are further subject to jurisdiction in Kentucky based upon, but not limited to, transactions in Kentucky causing tortious injury to the Plaintiffs, and their acts or omissions occurring outside Kentucky but injuring Plaintiffs within Kentucky. Further, NPC, Swiss Novartis and Novartis Germany engaged in or solicited business within Kentucky from which they derived substantial revenue from Elidel being sold, prescribed and used in Kentucky.

22.     In or about 2001, NPC, Swiss Novartis and Novartis Germany received Food and Drug Administration ("FDA") approval of Elidel for the treatment of atopic dermatitis. The product had limited prescribing restrictions for its use and application including, for example, that it should not be prescribed for long term use and as a second-line therapy only after first-line treatment with steroids were ineffective or could not be used.

23.     The product, Elidel, with its active ingredient, pimecrolimus, was and is a substantial cause in the development of cancer, lymphadenopathy, lymphomas, serious upper respiratory diseases and other injuries, harms and dangers suffered by Philip Weiss, who used and applied the product in accordance with the manufacturer's instructions. As a result of its inherent dangers, Elidel is defective by design, formulation, manufacture, distribution and sale. Further, NPC, Swiss Novartis and Novartis Germany all failed to adequately warn of cancer risks associated with Elidel to Philip Weiss and/or to his physician, Dr. Joseph Bark.

24.     Weiss used and applied both Protopic and Elidel beginning in 2003 through November 2004, having obtained the products from lawful prescriptions and by free samples provided by his physician, Dr. Joseph Bark. As a direct and proximate result of the use and application of Protopic and Elidel, Philip Weiss suffered serious bodily injury and harm, including being diagnosed with lymphoma. At no time material to his use of Protopic and Elidel was Weiss

6

told, warned or given information about the risks of developing cancer or lymphoma cause by the use of Protopic and Elidel.

25.     All Defendants in this action by their design, manufacture, processing, preparing, distributing, marketing and selling Protopic and Elidel combined to be a proximate cause of the injuries and damages to Philip Weiss. All Defendants are jointly and severally liable for the damages claimed herein.

26.     As a direct and proximate cause of Weiss' use and application of Protopic and Elidel he suffered serious personal injuries, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of cancer or lymphoma.  Weiss has further incurred medical bills and other healthcare expenses, past lost wages, and will have a diminution of future wages.  Weiss' physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of Protopic and Elidel are permanent and continuing compromise, diminishment and suppression of his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events, all of which are a sole and proximate cause of Protopic and Elidel.

27.     This lawsuit arises out of Plaintiff, Philip C. Weiss', diagnosis of a form of cancer as a result of Defendants' conduct.

28.     Defendants are engaged in the business of designing, manufacturing and marketing various types of prescription drugs for use in the care and treatment of human illnesses.  Such drugs include Protopic and Elidel, which Defendants, APUS and API as well as NPC, Swiss Novartis and Novartis Germany, designed, manufactured and marketed, respectively, as safe and effective drugs

7

for the treatment of atopic dermatitis (eczema).

29.     Defendants purposefully and/or negligently downplayed and understated the health hazards and risks associated with the use of Protopic and Elidel. In fact, Defendants encouraged the belief that Protopic and Elidel had been tested and medically proven safe and effective for use with adults and children. To the contrary, Protopic and Elidel have been shown to carry serious risks in adults and especially in children. More specifically, Protopic and Elidel have been shown to carry a serious risk of cancer.

30.     Pleading more specifically, without the waiver of the foregoing, Defendants, APUS and API marketed Protopic to Plaintiff, Philip C. Weiss, for use at the onset of treatment for his atopic dermatitis (eczema) despite FDA restrictions on such use. More specifically, since the beginning of its Protopic marketing campaign and in November 2003, when Protopic was first prescribed for Plaintiff, Defendants APUS and API represented to Plaintiffs that its drug was a safer alternative to steroids and could be used as first line of therapy for eczema. However, upon information and belief, the FDA had restricted Protopic to a second-line therapy because of the increased incidence of adverse events, some of which were deemed serious by FDA examiners. In fact, upon information and belief, studies showed a disproportionately increased incidence of adverse events with Protopic and the FDA examiner recommended that physicians be made aware of these risks. Plaintiffs were not informed of such restriction at the time of the first prescription in November 2003 and they were not informed of the adverse events and Protopic was prescribed to Plaintiffs as a first-line therapy.

31.     In addition to the foregoing, Defendants APUS and API were aware that lymphoma was identified as a serious adverse event for Protopic as early as 1999. Despite such knowledge,

8

Defendants, APUS and API, marketed the product without a cancer warning from the beginning of its marketing campaign and in November 2003, when Protopic was first prescribed to Plaintiff, Philip C. Weiss. Further, upon information and belief, in 2003, the FDA recommended that Defendants, APUS and API revise their product inserts to warn patients of the significant adverse events, such as cancer, from their drug. Finally in March 2005, after accumulating scientific evidence of deaths and serious repercussions the FDA required Defendants, APUS and API to place a "black box" warning of cancer risks on Protopic because of its widespread use and Defendants' heavy advertising therefore despite lack of appreciation in patients and physicians of the cancer risks.

32.     Since the beginning of their marketing campaign and in November 2003 when Protopic was prescribed for Plaintiff, Philip C. Weiss, Defendants, APUS and API made material representations, that Protopic had been clinically and laboratory tested and medically proven safe. As set forth above, Defendants, APUS and API represented that their product was appropriate as a first-line therapy and that it was safe, effective, and well tolerated for patients such as Philip C. Weiss, when in fact, it was not.

33.     Plaintiffs reasonably relied upon such representations in deciding to begin using Protopic and, but for such representations of safety, appropriateness and efficacy, Plaintiff, Philip C. Weiss would not have used Protopic.

34.     At the time the representations were made to Plaintiffs in November 2003, upon their initial use of Protopic, they were false and Defendants, APUS and API knew they were false.

35.     Defendant also failed to represent to Plaintiffs in November 2003 that Protopic could cause serious health problems including cancer, which Defendants APUS and API had been aware of as early as 1999.

9

36.     This omission was material and induced Plaintiffs to use Protopic. If Plaintiffs had been told that Protopic could cause cancer, they would not have used it.

37.     This omission by Defendants, APUS and API was material and intentional and it had the desired effect-to-induce continued use of the drug, Protopic by Plaintiffs and millions of others.

38.     Plaintiffs' purchased Protopic and began using it as prescribed and advised by their physician. On or about December 3, 2004, Philip C. Weiss was diagnosed with Cutaneous T-Cell Lymphoma.

39.     Pleading more specifically, without waiver of the foregoing, Defendants, NPC, Swiss Novartis and Novartis Germany, marketed Elidel to Plaintiff, Philip C. Weiss, for use at the onset of treatment for his atopic dermatitis (eczema) despite FDA restrictions on such use. More specifically, since the beginning of its Elidel marketing campaign and in August 2003 when Elidel was first prescribed for Plaintiff, Defendants, NPC, Swiss Novartis and Novartis Germany, represented to Plaintiffs that their drug was a safer alternative to steroids and could be used as a first-line of therapy for eczema. However, upon information and belief, the FDA had restricted Elidel to a second-line therapy because of the increased incidence of adverse events, some of which were deemed serious by FDA examiners. In fact, upon information and belief, studies showed a disproportionately increased incidence of adverse events with Elidel and the FDA examiner recommended that physicians be made aware of these risks. Plaintiffs were not informed of such restriction at the time of the first prescription in August 2003 and they were not informed of the adverse events and Elidel was prescribed to Plaintiffs as a first-line therapy.

40.     In addition to the foregoing, Defendants, NPC, Swiss Novartis and Novartis Germany, were aware that lymphoma was identified as a serious adverse event for Elidel as early as

10

1999. Despite such knowledge, Defendants, NPC, Swiss Novartis and Novartis Germany, marketed the product without a cancer warning from the beginning of its marketing campaign and in August 2003, when Elidel was first prescribed to Plaintiff, Philip C. Weiss. Further, upon information and belief, in 2003, the FDA recommended that Defendants, NPC, Swiss Novartis and Novartis Germany, revise their product inserts to warn patients of the significant adverse events, such as cancer, from their drug. Finally in March 2005, after accumulating scientific evidence of deaths and serious repercussions the FDA required Defendants, NPC, Swiss Novartis and Novartis Germany, to place a "black box" warning of cancer risks on Elidel because of its widespread use and Defendants' heavy advertising therefore despite lack of appreciation in patients and physicians of the cancer risks.

41.    Since the beginning of their marketing campaign and in August 2003 when Elidel was prescribed for Plaintiff, Philip C. Weiss, Defendants, NPC, Swiss Novartis and Novartis Germany made material representations, that Elidel had been clinically and laboratory tested and medically proven safe. As set forth above, Defendants, NPC, Swiss Novartis and Novartis Germany represented that their product was appropriate as a first-line therapy and that it was safe, effective, and well tolerated for patients such as Philip C. Weiss, when in fact, it was not.

42.    Plaintiffs reasonably relied upon such representations in deciding to begin using Elidel and, but for such representations of safety, appropriateness and efficacy, Plaintiff, Philip C. Weiss would not have used Elidel.

43.    At the time the representations were made to Plaintiffs in August 2003, upon their initial use of Elidel, they were false and Defendants, NPC, Swiss Novartis and Novartis Germany knew they were false.

44.    Defendants also failed to represent to Plaintiffs in August 2003 that Elidel could

cause serious health problems including cancer, which Defendants NPC, Swiss Novartis and Novartis Germany had been aware of as early as 1999.

45.     This omission was material and induced Plaintiffs to use Elidel. If Plaintiffs had been told that Elidel could cause cancer, they would not have used it.

46.     This omission by Defendants, NPC, Swiss Novartis and Novartis Germany was material and intentional and it had the desired effect-to-induce continued use of the drug, Elidel by Plaintiffs and millions of others.

47.     Plaintiffs' purchased Elidel and began using it as prescribed and advised by their physician. On or about December 3, 2004, Philip C. Weiss was diagnosed with Cutaneous T-Cell Lymphoma.

## Count I - Negligence
## Against APUS and API

48.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-13 and 24-38 above.

49.     APUS and API as the designer, manufacturer, distributor, processor, formulator, seller, marketer and supplier of Protopic had a duty to the patients to whom they expected their drug to be prescribed, including Weiss, to exercise reasonable care in the design, manufacture, formulation, testing, sale, marketing and distribution of Protopic.

50.     APUS and API had a duty to exercise reasonable care that Protopic was safe, efficacious, and free from all known, or what they should have known to be severe adverse events including the risk of cancer, and lymphoma caused from its use by Weiss, to whom Protopic had been prescribed by his healthcare provider.

12

51.    APUS and API knew, or in the exercise of reasonable care should have known, that Protopic caused serious and potentially severe adverse events, consequences and reactions when used and applied, even in accordance with defendants' instructions, by patients such as Weiss. These serious and/or potentially severe health consequences included, but was not limited to, immune deficiencies, cancer, lymphoma, chronic upper respiratory ailments, and other harmful diseases and illnesses.

52.    APUS and API breached their duty by designing, manufacturing, marketing, distributing and selling a defective and unreasonably dangerous drug, Protopic.

53.    That Weiss, both through samples and prescriptions utilized Protopic on the body surface areas of his person beginning on or about August 2003 to treat a skin disease for which the drug had been prescribed, and for a skin disease it was intended to treat. As a direct and proximate cause of the use and application of Protopic by Weiss, he developed cancer, lymphoma, physical ailments, and other serious adverse health conditions.

## Count II - Negligent Failure to Warn
## Against APUS and API

54.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-13 and 24-38 above.

55.    APUS and API had a duty to provide adequate warnings with their product Protopic, including to ensure that adequate warnings were provided to healthcare providers, including Dr. Joseph Bark the physician for Weiss, concerning the safety and any heath risks known or which should have been known resulting from the use and application of Protopic.

56.    APUS and API breached their duty by failing to use reasonable care in providing

13

adequate warnings to healthcare providers, including Weiss' treating physician, Dr. Joseph Bark, about the serious adverse health risks caused by Protopic. Specifically, APUS and API failed to adequately warn Weiss and/or his physician, Dr. Joseph Bark, about the serious health risks and adverse events caused by long term use of Protopic, that there were more severe health risks in Protopic as a "steroid free" product than corticosteroids which are traditionally used in the treatment of the type of skin disease that Weiss suffered from, and about the risks of developing cancer and lymphomas from the use and application of Protopic.

57.    Both APUS and API had knowledge that Protopic, as early as the year 1999 posed serious adverse health risks of cancer and lymphomas to patients who would use and apply Protopic for the treatment of skin diseases to which the product was designed to treat. Both APUS and API failed to warn Weiss, or his physician, Dr. Joseph Bark, of these health risks. APUS and API as the designer, manufacturer, distributor, marketer and seller of Protopic were in a superior position to that of Weiss or his physician, Dr. Joseph Bark, and other healthcare providers, to have knowledge about these serious adverse health risks posed by Protopic, including the risk of cancer and lymphomas. Defendants failed to adequately warn Br. Joseph Bark so that he could make an appropriate, informed and independent judgment with respect to what drug to use in the treatment of Philip Weiss.

58.    As a result of APUS and API's failure to adequately warn healthcare providers about the serious health risks posed by Protopic, including developing cancer and lymphomas, Dr. Joseph Bark gave samples to and prescribed Protopic for Weiss.

59.    Had APUS and API adequately warned Weiss and/or his physician, Dr. Joseph Bark, samples and/or prescriptions of Protopic would not have been given to him, or Weiss would not have

14

used and applied the product.

## Count III - Intentional Misrepresentations
## By APUS and API

60.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-13 and 24-38 above.

61.    Beginning as early as 1999, Defendants APUS and API has specific knowledge about serious adverse events, reactions, defects, health risks, unreasonable and inherent dangers and consequences posed by the use and application of Protopic, including the development of cancer and lymphoma. These dangers and health risks were known by both defendants based upon scientific evidence, their own research, post-marketing adverse events, clinical studies, animal studies, and secret studies conducted which were not made public. Despite possession this knowledge, APUS, and API intentionally misrepresented the safety of Protopic by representing the drug did not impose any undue, inherent or serious health risks to persons who were prescribed the product and/or given samples by their healthcare providers.

62.    Additionally, both APUS and API intentionally misrepresented the safety of Protopic through its product brochures, product inserts information and by oral presentations made by its employees to Weiss' healthcare provider, Dr. Joseph Bark. These misrepresentations about the safety of Protopic included the fact that the drug did not pose any unreasonable or inherent health risks to patients to whom it was prescribed or given samples, that being steroid-free it was completely safe, and safer than topical corticosteroids, there was no risk of cancer or lymphoma associated with the use and application of Protopic, that Protopic was safe to be used as a first-line therapy of treatment when in fact the drug was only intended to be a second-line therapy, and finally

that Protopic was safe for long term use when in fact it was not.

64.     Despite the knowledge of APUS and API to the contrary, they misrepresented information both orally and in writing to healthcare providers, including Weiss' treating physician, Dr. Joseph Bark, about the safety of Protopic.  Both APUS and API intentionally misrepresented Protopic as "steroid free" and safer than topical corticosteroids, for the express purpose of having physicians, including the healthcare provider of Weiss, Dr. Joseph Bark, prescribe the product and give out samples to their patients who were diagnosed with the type of skin diseases Protopic was intended and designed to treat.  Both APUS and API intentionally misrepresented information to healthcare providers, including Dr. Joseph Bark, about the lack of serious health and cancer risks resulting from the use and application of Protopic, and about the absence of any serious health risks and consequences of Protopic knowing there would be reliance on these misrepresentations in making decisions on prescribing Protopic for patients or giving them samples of Protopic.

64.     These misrepresentations by APUS and API were material in that they involved statements about the safety and lack of health risks associated with Protopic.  APUS and API intended that the treating healthcare physician, specifically Dr. Joseph Bark, would rely on these misrepresentations which APUS and API knew to be false, or which were made in a reckless manner.  In this case, Dr. Joseph Bark provided samples and wrote prescriptions for Protopic for Weiss based upon the misrepresentations made by APUS and API.

65.     Since the beginning of their marketing campaign and in November 2003 when Protopic was prescribed for Plaintiff, Philip C. Weiss, Defendants, APUS and API made material representations that Protopic have been clinically and laboratory tested and medically proven safe. As set forth above, Defendants, APUS and API represented that their product was appropriate as a

16

first-line therapy and that it was safe, effective, and well tolerated for patients such as Philip C. Weiss, when in fact, it was not. At the time the representations were made to Plaintiffs in November 2003 upon Plaintiffs initial use of Protopic, they were false and Defendants knew they were false.

66.     Plaintiffs reasonably relied upon such representations in deciding to begin using Protopic in November 2003 and, but for such representations of safety and appropriateness, they would not have used Protopic.  Specifically, Philip C. Weiss was informed and told, through his treating physician, as the conduit for APUS and API, that Protopic would help Plaintiff's condition and that it (Protopic) had shown positive results with resistant skin conditions.  On November 26, 2003, Philip Weiss was given samples of and a prescription for Protopic and on that same date was told that this drug (Protopic) was a non-steroid cream.  No information regarding any instances or incidence of adverse events or other serious risks associated with Protopic were relayed to Plaintiffs.

67.     Upon information and belief, Defendants, APUS and API were aware that lymphoma was identified as a serious adverse event for Protopic as early as 1999.  Despite such knowledge, Defendants marketed the product without a cancer warning from the beginning of its marketing campaign and in November 2003, when Protopic was first prescribed and/or given to Philip C. Weiss. Further, upon information and belief, in 2003, the FDA recommended that Defendants revise their product inserts to warn patients of the significant adverse events, such as cancer, from their drug.  It is all too evident the Defendants purposefully marketed their drug with insufficient and/or no warnings regarding the adverse events associated with their product from the beginning of their marketing campaign until and even after Plaintiff was prescribed Protopic in November 2003.  In fact, in March 2005, after accumulating scientific evidence of deaths and serious repercussions, the FDA required Defendants to place a "black box" warning of cancer risks on Protopic because of its

17

widespread use and Defendants' heavy advertising therefore despite lack of appreciation in patients and physicians of the cancer risk.

68.     Defendants, APUS and API also failed to represent to Plaintiffs in November 2003 that Protopic could cause serious health problems including cancer, which Defendants had been aware of as early as 1999.

69.     As stated above, this omission was material and induced Plaintiffs to use Protopic. If they had been told that Protopic could cause cancer, they would not have used it.

<u>**Count IV - Strict Liability For Defect**</u>
<u>**Against APUS and API**</u>

70.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-13 and 24-38 above.

71.     APUS and API designed, manufactured, formulated, created, processed, tested, distributed, shipped, marketed, and sold Protopic, and placed said product in the stream of commercial distribution.

72.     That at all times material hereto, the drug Protopic when used and applied by Weiss, was in the same or substantially same condition as when it left the control and possession of APUS and API.

73.     Weiss was, and is an individual, whom APUS and API reasonably expected to use, apply and be exposed to Protopic through either, or both, the distribution of samples left by the APUS and API sales representatives with healthcare providers, or through writing prescriptions of Protopic for the treatment of certain skin diseases.

74.     Protopic, at the time it left the control, possession and custody of APUS and API

18

was in a condition which rendered it unreasonably and inherently dangerous for use by ultimate consumers generally, and specifically by Weiss.

75.     Protopic, at the time it left the control, possession and custody of APUS and API was defective in that a reasonable consumer would not expect that the drug would have serious adverse consequences, events and health risks related to it, including, but not limited to development of cancer, lymphadenopathy, lymphomas, and suppression of the body's natural immune system which resulted in other serious health problems and diseases. At all material times hereto Protopic was unreasonably dangerous because of its design, formulation and manufacture as it failed to perform as safely as an ordinary consumer would expect, and Weiss specifically, when used as intended or in a manner reasonably expected by APUS and API.

76.     That the defects in the product Protopic was latent in nature, not patent, and which would not be known to Weiss specifically, or to his healthcare provider, Dr. Joseph Bark. Further, the defects in the drug Protopic were not of the type which would be subject to or discoverable from any inspection by either Weiss or his healthcare provider.

### Count V - Strict Liability Failure to Warn
### Against APUS and API

77.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-13 and 24-38 above.

78.     APUS and API designed, manufactured, formulated, created, processed, tested, distributed, shipped, marketed, and sold Protopic and place said product in the stream of commercial distribution.

79.     That at all material times hereto, the Protopic drugs used and applied by Weiss were

19

in the same or substantially same condition as when they left the control and possession of APUS and API.

80.     Weiss was, and is an individual, whom APUS and API reasonably expected to use, apply and be exposed to Protopic through either, or both, the distribution of samples left by the APUS and API sales representatives with healthcare providers, or through writing prescriptions of Protopic for the treatment of certain skin diseases.

81.     Protopic, at the time it left the control, possession and custody of APUS and API was in a condition which rendered it unreasonably and inherently dangerous for use by ultimate consumers generally, and specifically by Weiss.

82.     Protopic, at the time it left the control, possession and custody of APUS and API was defective in that a reasonable consumer would not expect that the drug would have serious adverse consequences, events and health risks related to it, including, but not limited to development of cancer, lymphadenopathy, lymphomas, and suppression of the body's natural immune system which resulted in other serious health problems and diseases.

83.     That the defects in the product Protopic was latent in nature, not patent, and which would not be known to Weiss specifically, or to his healthcare provider, Dr. Joseph Bark. Further, the defects in the drug Protopic were not of the type which would be subject to or discoverable from any inspection by either Weiss or his healthcare providers.

84.     That by its design, creation, formulation, processing, manufacture, marketing, distribution and sale, Protopic was an inherently dangerous product for use by consumers, and could not otherwise be made safe by changing its formulation or ingredients for its intended use. Protopic was not reasonably safe due to inadequate warnings provided by APUS and API of the foreseeable

20

health risks of cancer and lymphomas developing from the product's use and application. As a direct result of the failure to adequately warn, APUS and API are strictly liable in that their drug, Protopic, was defective since warnings about foreseeable risks of harm, including that of cancer and lymphomas, were not given. In the alternative, Protopic was defective in that APUS and API did not provide warnings to Weiss when they had reason to know his treating physician, Dr. Joseph Bark, was not in a position to reduce the risk of harm in accordance with the inadequate warnings given.

85.     Additionally, APUS and API are strictly liable for a defect in Protopic by their failure to adequately warn Weiss of the foreseeable health risks of cancer and lymphomas caused by the use of Protopic because they participated in direct to consumer advertising to bypass the learned intermediary treating physician.

### Count VI - Negligence
### Against NPC, Swiss Novartis and Novartis Germany

86.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-2, 14-29 and 39-47 above.

87.     NPC, Swiss Novartis and Novartis Germany as the designed, manufacturer, distributor, processor, formulator, seller, marketer and supplier of Elidel had a duty to the patients to whom the expected their drug to be prescribed, including Weiss, to exercise reasonable care in the design, manufacture, formulation, testing, sale, marketing and distribution of Elidel.

88.     NPC, Swiss Novartis and Novartis Germany had a duty to exercise reasonable care that Elidel was safe, efficacious, and free from all known, or what they should have known to be severe adverse events including the risk of cancer, and lymphoma cause from its use by Weiss, to whom Elidel had been prescribed by his healthcare provider.

21

89.    NPC, Swiss Novartis and Novartis Germany knew, or in the exercise of reasonable care should have known, that Elidel caused serious and potentially severe adverse events, consequences and reactions when used and applied, even in accordance with defendants' instructions, by patients such as Weiss. These serious and/or potentially severe health consequences included, but were not limited to, immune deficiencies, cancer, lymphoma, chronic upper respiratory ailments, and other harmful diseases and illnesses.

90.    NPC, Swiss Novartis and Novartis Germany breached their duty by designing, manufacturing, marketing, distributing and selling a defective and unreasonably dangerous drug, Elidel.

91.    That Weiss, both through samples and prescriptions utilized Elidel on the body surface areas of his person beginning on or about August 2003 to treat a skin disease for which the drug had been prescribed, and for a skin disease it was intended to treat. As a direct and proximate cause of the use and application of Elidel by Weiss, he developed cancer, lymphoma, physical ailments, and other serious adverse health conditions.

### Count VII - Negligent Failure to Warn
### Against NPC, Swiss Novartis and Novartis Germany

92.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-2, 14-29 and 39-47 above.

93.    NPC, Swiss Novartis and Novartis Germany had a duty to provide adequate warnings with their product Elidel, including to insure that adequate warnings were provided to healthcare providers, including Dr. Joseph Bark the physician for Weiss, concerning the safety and any health risks known or should have been known resulting from the use and application of Elidel.

22

94.     NPC, Swiss Novartis and Novartis Germany breached their duty by failing to use reasonable care in providing adequate warnings to healthcare providers, including to Dr. Joseph Bark, treating physician of Weiss, about the serious adverse health risks caused by Elidel. Specifically, NPC, Swiss Novartis and Novartis Germany failed to adequately warn Weiss and/or his physician, Dr. Bark about the serious health risks and adverse events caused by long term use of Elidel, that there were more severe health risks in Elidel as a "steroid free" product than corticosteroids traditionally used in the treatment of the type of skin disease that Weiss had, and about the risks of developing cancer and lymphomas from the use and application of Elidel.

95.     NPC, Swiss Novartis and Novartis Germany had knowledge that Elidel, since at least as early as the year 1999 posed serious adverse health risks of cancer and lymphomas to patients who would use and apply Elidel for the treatment of skin diseases to which the product was designed to treat.  NPC, Swiss Novartis and Novartis Germany failed to warn Weiss, or his physician, Dr. Joseph Bark, of these health risks.  NPC, Swiss Novartis and Novartis Germany as the designer, manufacturer, distributor, marketer and seller of Elidel were in a superior position to that of Weiss or his physician, Dr. Joseph Bark, and other healthcare providers, to have knowledge about these serious adverse health risks posed by Elidel, including the risk of cancer and lymphomas. Defendants failed to adequately warn Dr. Bark so that he could make an appropriate, informed, and independent judgment with respect to what drug to use in the treatment of Philip Weiss.

96.     As a result of NPC, Swiss Novartis and Novartis Germany's failure to adequately warn healthcare providers about the serious health risks posed by Elidel, including developing cancer and lymphomas, Dr. Bark gave samples to and prescribed Elidel for Weiss.

97.     That had NPC, Swiss Novartis and Novartis Germany adequately warned Weiss

23

and/or his physician, Dr. Joseph Bark, samples and/or prescriptions of Elidel would not have been given to him, or Weiss would not have used and applied the product.

## Count VIII - Intentional Misrepresentations
## By NPC, Swiss Novartis and Novartis Germany

98.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-2, 14-29 and 39-47 above.

99.     Beginning as early as 1999, Defendants NPC, Swiss Novartis and Novartis Germany has specific knowledge about serious adverse events, reactions, defects, health risks, unreasonable and inherent dangers and consequences posed by the use and application of Elidel, including the development of cancer and lymphoma.  These dangers and health risks were known by defendants based upon scientific evidence, their own research, post-marketing adverse events, clinical studies, animal studies, and secret studies conducted which were not made public.  Despite possession this knowledge, NPC, Swiss Novartis and Novartis Germany intentionally misrepresented the safety of Elidel by representing the drug did not impose any undue, inherent or serious health risks to persons who were prescribed the product and/or given samples by their healthcare providers.

100.    Additionally, NPC, Swiss Novartis and Novartis Germany intentionally misrepresented the safety of Elidel through its product brochures, product inserts, information and by oral presentations made by its employees to Weiss' healthcare provider, Dr. Joseph Bark.  These misrepresentations about the safety of Elidel included the fact that the drug did not pose any unreasonable or inherent health risks to patients to whom it was prescribed or given samples, that being steroid-free it was completely safe, and safer than topical corticosteroids, there was no risk of cancer or lymphoma associated with the use and application of Elidel, that Elidel was safe to be used

as a first-line therapy of treatment when in fact the drug was only intended to be a second-line therapy, and finally that Elidel was safe for long term use when in fact it was not.

101.   Despite the knowledge of NPC, Swiss Novartis and Novartis Germany to the contrary, they misrepresented information both orally and in writing to healthcare providers, including Weiss' treating physician, Dr. Joseph Bark, about the safety of Elidel. NPC, Swiss Novartis and Novartis Germany intentionally misrepresented Elidel as "steroid free" and safer than topical corticosteroids, for the express purpose of having physicians, including the healthcare provider of Weiss, Dr. Joseph Bark, prescribe the product and give out samples to their patients who were diagnosed with the type of skin diseases Elidel was intended and designed to treat. NPC, Swiss Novartis and Novartis Germany intentionally misrepresented information to healthcare providers, including Dr. Joseph Bark, about the lack of serious health and cancer risks resulting from the use and application of Elidel, and about the absence of any serious health risks and consequences of Elidel knowing there would be reliance on these misrepresentations in making decisions on prescribing Elidel for patients or giving them samples of Elidel.

102.   These misrepresentations by NPC, Swiss Novartis and Novartis Germany were material in that they involved statements about the safety and lack of health risks associated with Elidel. NPC, Swiss Novartis and Novartis Germany intended that the treating healthcare physician, specifically Dr. Joseph Bark, would rely on these misrepresentations which NPC, Swiss Novartis and Novartis Germany knew to be false, or which were made in a reckless manner. In this case, Dr. Joseph Bark provided samples and wrote prescriptions for Elidel for Weiss based upon the misrepresentations made by NPC, Swiss Novartis and Novartis Germany.

103.   Since the beginning of their marketing campaign and in August 2003 when Elidel

25

was prescribed fro Plaintiff, Philip C. Weiss, Defendants, NPC, Swiss Novartis and Novartis Germany made material representations that Elidel had been clinically and laboratory tested and medically proven safe. As set forth above, Defendants, NPC, Swiss Novartis and Novartis Germany represented that their product was appropriate as a first-line therapy and that it was safe, effective, and well tolerated for patients such as Philip C. Weiss, when in fact, it was not. At the time the representations were made to Plaintiffs in August 2003 upon Plaintiffs initial use of Elidel, they were false and Defendants knew they were false.

104.    Plaintiffs reasonably relied upon such representations in deciding to begin using Elidel in August 2003 and, but for such representations of safety and appropriateness, they would not have used Elidel. Specifically, Philip C. Weiss was informed and told, through his treating physician, as the conduit for NPC, Swiss Novartis and Novartis Germany, that Elidel was showing good results in patients with dermatitis and that is was the *best remedy* on the market for his current skin condition. Dr. Bark recommend, based upon the representations of NPC, Swiss Novartis and Novartis Germany, that Weiss should *give it a try*. On August 12, 2003, Philip Weiss was given samples of and a prescription for Elidel and on that same date was told that this drug (Elidel) was a non-steroid cream. No information regarding any instances or incidence of adverse events or other serious risks associated with Elidel were relayed to Plaintiffs.

105.    Upon information and belief, Defendants, NPC, Swiss Novartis and Novartis Germany were aware that lymphoma was identified as a serious adverse event for Elidel as early as 1999. Despite such knowledge, Defendants marketed the product without a cancer warning from the beginning of its marketing campaign and in August 2003, when Elidel was first prescribed and/or given to Philip C. Weiss. Further, upon information and belief, in 2003, the FDA recommended that

26

Defendants revise their product inserts to warn patients of the significant adverse events, such as cancer, from their drug. It is all too evident the Defendants purposefully marketed their drug with insufficient and/or no warnings regarding the adverse events associated with their product from the beginning of their marketing campaign until and even after Plaintiff was prescribed Elidel in August 2003. In fact, in March 2005, after accumulating scientific evidence of deaths and serious repercussions, the FDA required Defendants to place a "black box" warning of cancer risks on Protopic because of its widespread use and Defendants' heavy advertising therefore despite lack of appreciation in patients and physicians of the cancer risk.

106. Defendants, NPC, Swiss Novartis and Novartis Germany also failed to represent to Plaintiffs in August 2003 that Elidel could cause serious health problems including cancer, which Defendants had been aware of as early as 1999.

107. As stated above, this omission was material and induced Plaintiffs to use Protopic. If they had been told that Protopic could cause cancer, they would not have used it.

### Count IX - Strict Liability For Defect
### Against NPC, Swiss Novartis and Novartis Germany

108. Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-2, 14-29 and 39-47 above.

109. That NPC, Swiss Novartis and Novartis Germany designed, manufactured, formulated, created, processed, tested, distributed, shipped, marketed, and sold Elidel, and placed said product in the stream of commercial distribution.

110. That at all times material hereto, the drugs Elidel when used and applied by Weiss were in the same or substantially same condition as when they left the control and possession of

NPC, Swiss Novartis and Novartis Germany.

111.    Weiss was, and is an individual whom NPC, Swiss Novartis and Novartis Germany reasonably expected to use, apply, and be exposed to Elidel through either, or both, the distribution of samples left by the NPC, Swiss Novartis and Novartis Germany sales representatives with healthcare providers, or through writing prescriptions of Elidel for the treatment of certain skin diseases.

112.    Elidel, at the time it left the control, possession and custody of Defendants was in a condition which rendered it unreasonably and inherently dangerous for use by ultimate consumers generally, and specifically by Weiss.

113.    Elidel, at the time if left the control, possession and custody of Defendants was defective in that a reasonable consumer would not expect that the drug would have serious adverse consequences, events and health risks related to it, including but not limited to development of cancer, lymphadenopathy, lymphomas, and suppression of the body's natural immune system which resulted in other serious health problems and diseases.   At all material times hereto Elidel was unreasonably dangerous because of its design, formulation and manufacture as it failed to perform as safely as an ordinary consumer would expect, and Weiss specifically, when used as intended or in a manner reasonably expected by NPC, Swiss Novartis and Novartis Germany.

114.    That the defects in the product Elidel was latent in nature, not patent, and which would not be known to Weiss specifically, or to his healthcare provider, Dr. Joseph Bark.  Further, the defects in the drug Elidel were not of the type which would be subject to or discoverable from any inspection by either Weiss or his healthcare provider.

### Count X - Strict Liability Failure to Warn
### Against NPC, Swiss Novartis and Novartis Germany

115.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-2, 14-29 and 39-47 above.

116.    That NPC, Swiss Novartis and Novartis Germany designed, manufactured, formulated, created, processed, tested, distributed, shipped, marketed, and sold Elidel, and placed said product in the stream of commercial distribution.

117.    That at all times material hereto, the Elidel drugs used and applied by Weiss were in the same or substantially same condition as when they left the control and possession of NPC, Swiss Novartis and Novartis Germany.

118.    Weiss was, and is an individual whom NPC, Swiss Novartis and Novartis Germany reasonably expected to use, apply, and be exposed to Elidel through either, or both, the distribution of samples left by the NPC, Swiss Novartis and Novartis Germany sales representatives with healthcare providers, or through writing prescriptions of Elidel for the treatment of certain skin diseases.

119.    Elidel, at the time it left the control, possession and custody of Defendants, was in a condition which rendered it defective, and unreasonably and inherently dangerous for use by ultimate consumers generally, and specifically by Weiss.

120.    Elidel, at the time if left the control, possession and custody of Defendants was defective in that a reasonable consumer would not expect that the drug would have serious adverse consequences, events and health risks related to it, including but not limited to development of cancer, lymphadenopathy, lymphomas, and suppression of the body's natural immune system which

29

results in other serious health problems and diseases.

121.   That the defect in the product Elidel was latent in nature, not patent, and which would not be known to Weiss specifically, or to his healthcare provider, Dr. Joseph Bark. Further, the defects in the drug Elidel was not of the type which would be subject to or discoverable from any inspection by either Weiss, or his healthcare providers.

122.   That by its design, creation, formulation, processing, manufacture, marketing, distribution and sale, Elidel was an inherently dangerous product for use by consumers, and could not otherwise by made safe by changing its formulation or ingredients for its intended use. Elidel was not reasonably safe due to inadequate warnings provided by NPC, Swiss Novartis and Novartis Germany of the foreseeable health risks of cancer and lymphomas developing from the product's use and application. As a direct result of failure to adequately warn, NPC, Swiss Novartis and Novartis Germany are strictly liable in that their drug, Elidel, was defective since warnings about foreseeable risks of harm, including that of cancer and lymphomas were not given. In the alternative, Elidel was defective in that NPC, Swiss Novartis and Novartis Germany did not provide warnings to Weiss when they had reason to know his treating physician, Dr. Joseph Bark, was not in a position to reduce the risk of harm in accordance with the inadequate warnings given.

123.   In addition, NPC, Swiss Novartis and Novartis Germany are strictly liable for a defect in Elidel by their failure to adequately warn Weiss of the foreseeable health risks of cancer and lymphomas caused by the use of Elidel because they participated in direct to consumer advertising to bypass the learned intermediary treating physician.

## Count XI - Punitive Damages Against All Defendants

124.   Plaintiffs hereby adopt all prior allegations and incorporate herein as a basis for

punitive damages the allegations in Paragraphs 1-47, and Counts I - X.

125.    All Defendants acted maliciously, intentionally or with gross negligence in the design, manufacture, processing, formulating, processing, distributing, marketing and selling of Protopic and Elidel, which action amounted to a wanton or reckless disregard for the life and safety of Weiss, and to the lives and safety to persons in the Commonwealth of Kentucky, who used these two drugs.

126.    All Defendants had specific knowledge that their respective drugs, Protopic and Elidel, were unreasonably and inherently dangerous in causing cancer and lymphomas, and despite that knowledge continued to misrepresent the safety of these drugs; over-promoted these drugs to healthcare providers, including Dr. Bark, Weiss' physician, and to the general public, despite knowledge of these dangers; intentionally failed to advise the public, including healthcare providers, and Dr. Bark, of the health risks of these drugs; obfuscated, delayed, thwarted and fought efforts of the FDA to force adequate warnings for the public, and specifically healthcare providers, about the dangers of these drugs in creating risks of cancer and lymphomas; paid out large sums of monies and gifts, to doctors, healthcare providers, physicians, universities, organizations, the American Academy of Dermatology, and university research facilities in an attempt to enlist their assistance in misrepresenting the safety of these drugs to the public and healthcare providers; and, provided rebates, excessive discounts and kickbacks to wholesalers to increase the sales and use of these products in order to increase profits. All this intentional conduct was done with the specific purpose of increasing written prescriptions, distribution of samples, sales, and ultimately profits without any regard for the safety of the public in general, or to Weiss specifically.

127.    That said actions by all Defendants constituted wanton or reckless conduct.

31

128. Defendants maliciously, intentionally and/or with gross negligence and recklessness misrepresented to Weiss, his physician and the general public about Protopic and Elidel being safe and effective, that the benefits of taking Protopic and Elidel outweighed any risks, and/or fraudulently, intentionally and/or in a grossly negligent and reckless manner misrepresented and concealed valuable information about safety risks regarding said drugs, including but not limited to the propensity of said drugs to cause cancer and lymphomas.

129. The continuous and ongoing course of actions constituting misrepresentations on Weiss, his physician, Dr. Bark, and to the general public which began as early as 1998 or 1999 when Defendants submitted applications to market these two drugs for human use, if not earlier, and continued through repeated acts and non-disclosures of these cancer and lymphoma risks every year since then throughout the United States, and specifically in Kentucky.

130. Protopic and Elidel were in fact dangerously unsafe and posed risks of serious injury which outweighed the purported benefits of their use, which Defendants knew, and made a conscious decision to withhold this information from the public in its advertising and marketing to healthcare providers, and to the people in Kentucky, all with the express intent to keep their sales from falling and a loss of profits if the truth about the health risks of these drugs were known.

131. Defendants made misrepresentations and actively concealed adverse health information at a time when they knew that Protopic and Elidel had defects, dangers, and characteristics that were other than what they were representing to the prescribing doctors or other dispensing entities, and to the public through direct to consumer ads including Weiss.

132. In addition, Defendants consciously and intentionally made specific misrepresentations and/or active concealment of safety risks which they intended to be relied upon

32

by people in Kentucky, including, but are not limited to, the following:

A.       Failure to disclose that there had been insufficient clinical studies regarding the safety and efficacy of Protopic and Elidel;

B.       Marketing, promoting and/or selling Protopic and Elidel as if it was fully and adequately tested, when it was not;

C.       Misrepresenting the safety and efficacy of Protopic and Elidel in its labeling, advertising, product inserts, promotional materials, or other marketing and/or safety surveillance efforts;

D.       Misrepresenting the existence and adequacy of testing or Protopic and Elidel both pre- and post-marketing;

E.       Concealing or failing to disclose the severity and frequency of adverse health effects caused by Protopic and Elidel; and

F.       Continuing to disseminate false and misleading information about Protopic and Elidel even after Defendants knew of numerous adverse reports of cancer and lymphomas, and after the risk of cancer and lymphomas associated with Protopic and Elidel became public.

133.     Defendants undertook a conscious design and plan to put out false safety information about Protopic and Elidel, respectively, by among other things, express and implied statements, disseminating misinformation to the public and to regulatory agencies, giving inadequate, incomplete and misleading information about Protopic and Elidel, failing to disclose important safety and injury information regarding said drugs, and developing elaborate marketing, promotional, and advertising activities designed to conceal and mislead others about health risks of these two drugs.

## Count XII - Loss of Consortium Against All Defendants

134.   Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1-47 above.

135.   That as a direct and proximate cause of the injuries and damages sustained by Philip C. Weiss, this Plaintiff, Cassandra Weiss, has lost the support, services, comfort, companionship, society and care of her husband, loss of consortium, as well as having to hire and pay for services that were formerly performed by her husband, but for which he is no longer able to perform.

WHEREFORE, Plaintiffs, Philip Weiss and Cassandra Weiss, demand as follows:

(1)   Judgment for compensatory damages in excess of $75,000 against the Defendants, jointly and/or severally, and for such other amounts as a jury shall find will fairly and reasonably compensate Plaintiff, Philip Weiss, for the damages he has sustained;

(2)   Judgment for compensatory damages against the Defendants, jointly and/or severally, in amounts in excess of the minimum dollar amount necessary to establish jurisdiction of this Court and for such amounts as a jury shall find will fairly and reasonably compensate Plaintiff, Cassandra Weiss, for her loss of consortium;

(3)   Punitive Damages;

(4)   Prejudgment interest from the date of injury or filing of this action until paid;

(5)   Interest at the rate of 12 percent per annum from the date of judgment until paid;

(6)   Trial by jury;

(7)   Attorneys' fees and costs herein incurred; and

(8)   Any and all further proper relief to which they may appear to be entitled.

34

/s/Jennifer A. Moore
H. PHILIP GROSSMAN
JENNIFER A. MOORE
Fernandez Friedman Grossman & Kohn PLLC
2400 National City Tower
101 South Fifth Street
Louisville, KY 40202
(502) 589-1001
(502) 589-7333 (Fax)
pgrossman@ffgklaw.com
jmoore@ffgklaw.com

And

Larry M. Roth, Esquire
LAW OFFICE OF LARRY M. ROTH, P.A.
1615 Edgewater Drive
Suite 180 [32804]
Post Office Box 547637
Orlando, Florida 32854-7637
Telephone:  407-872-2239
Facsimile:  407-872-6927
E-mail:     lroth@roth-law.com

*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic filing to the following:

| | |
|---|---|
| Sam E. Isaacs II<br>Sam E. Isaacs, PLC<br>401 West Main Street - Suite 303<br>Lexington, Kentucky 40507<br>Telephone:   859 - 232-1044<br>Facsimile:   859 - 231-9639<br>sisaacs@sisaacslaw.com | **NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS INTERNATIONAL AG, and NOVARTIS PHARMA GmbH** |
| Susan S. Wettle<br>Ann E. Georgehead<br>Frost, Brown, Todd LLC<br>400 West Market Street, 32nd Floor<br>Louisville, Kentucky 40202<br>Telephone:  502 - 589-5400<br>Facsimile:   502 - 581-1087<br>swettle@fbtlaw.com | **ASTELLAS PHARMA US, INC., ASTELLAS PHARMA INC., and DEAN EGLER** |

I further certify that I mailed the foregoing document and the Notice of Electronic filing by U.S. Mail to the following non-CM/ECF participants on May 25, 2006:

| | |
|---|---|
| Of Counsel:<br>John Fagg<br>Kirby T. Griffis<br>Spriggs & Hollingsworth<br>1350 I Street, N.W.<br>Washington, D. C. 20005<br>Telephone:   202 - 898-5800<br>Facsimile:   202 -682-1639 | **NOVARTIS PHAMACEUTICALS CORPORATION** |

| | |
|---|---|
| Of Counsel:<br>Harvey L. Kaplan<br>Mark C. Hegarty<br>Laurie A. Henry<br>SHOOK, HARDY & BACON, LLP<br>2555 Grand Boulevard<br>Kansas City, Missouri  64108<br>Telephone:   816 - 474-6550<br>Facsimile:   816 - 421-5547 | **ASTELLAS PHARMA US, INC. and<br>ASTELLAS PHARMA INC.** |
| Of Counsel:<br>Grant J. Esposito<br>Michelle J. Annuziata<br>MAYER, BROWN, ROWE & MAW LLP<br>1675 Broadway<br>New York, NY  10019 | **NOVARTIS INTERNATIONAL AG<br>and NOVARTIS PHARMA GmbH** |

/s/ Jennifer A. Moore
Jennifer A. Moore

# EXHIBIT "E"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANDREA PERRY and GEORGE PERRY, both individually and as next friends of ANDREAS PERRY, a minor, | § § § § | **ELECTRONICALLY FILED** |
| Plaintiffs, | § § | Civil Action No.: 05-cv-05350 |
| v. | § § | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | § § § | |
| Defendant. | § § | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs, Andrea Perry, George Perry and Andreas Perry, by and through counsel, and for their Complaint against the Defendants, state:

**PARTIES**

1.     Plaintiff, Andrea Perry, is a resident and citizen of Coatesville, Chester County, Pennsylvania, and the next friend of Plaintiff Andreas Perry.

2.     Plaintiff, George Perry, is a resident and a citizen of Coatesville, Chester County, Pennsylvania, and the next friend of Plaintiff, Andreas Perry.

3.     Plaintiff, Andreas Perry, a minor, is a resident and citizen of Coatesville, Chester County, Pennsylvania.

4.     Defendant, Novartis Pharmaceuticals Corporation ("NPC") is a corporation incorporated under the laws of Delaware with its principal place of business located at 59 Route 10, East Hanover, New Jersey, 07936-1080.  Defendant is registered with the Pennsylvania Department of State, Division of Corporations and authorized to conduct business in

1

Pennsylvania as a foreign for-profit corporation. Service of process may be made on NPC by serving its designated registered agent, Secretary of State, Corporations Division.

5.    Defendant, Novartis Corporation ("Novartis Corp.") is a corporation incorporated under the laws of New York with its principal place of business located at 180 Park Avenue, Florham Park, New Jersey, 07932. Novartis Corporation is the North American headquarters of Swiss Novartis. Service of process may be made on Novartis Corp. by serving its designated registered agent, Secretary of State, Corporations Division.

6.    Defendant, Novartis Pharma GmbH (hereinafter "GmbH"), is a German corporation doing business in the United States, and Pennsylvania specifically, through its agent, subsidiary or alter-ego NPC and/or Novartis Corp. GmbH will be served with process through the Hague Convention on Service of Process Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters.

7.    Upon information and belief, Defendant, GmbH, is the ultimate physical manufacturer of the product in question and does so with the intent to sell, provide, distribute, supply or place in the stream of commerce either directly or indirectly through, Novartis Corp. and/or NPC, for ultimate use by consumers throughout the United States and the Commonwealth of Pennsylvania. Defendant, GmbH, is listed as the manufacturer on all packaging, labeling, product inserts, and patient information sheets provided to physicians and consumers in the United States and Pennsylvania.

8.    Defendant, Novartis AG (hereinafter "NAG"), is a Swiss corporation doing business in the United States, and Pennsylvania specifically, through its agent, subsidiary or alter-ego NPC, Novartis Corp., GmbH and/or Sales Representative Defendants, and is publicly traded on the New York Stock Exchange. NAG will be served with process through the Hague

2

Convention on Service of Process Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters.

9.       NAG, directly and indirectly, owns a 100% interest in NPC, Novartis Corp and GmbH. NAG is ultimately responsible for the organization, administration and direction of NPC and Novartis Corp, and determines the companies' strategies. NAG is also the patent holder of pimecrolimus and trademark holder of the word "ELIDEL" here, in the United States.

10.      Upon information and belief, members of the Board of Directors of NPC and/or Novartis Corp., sit on the Novartis Executive Committee which develops and implements strategies for the Novartis Group[1] and procures and allocates the required resources.

11.      As used herein, the term "Novartis Defendants" refers collectively to Defendants, Novartis Pharmaceuticals Corporation, Novartis Corporation, Novartis Pharma GmbH and Novartis AG.

12.      At all times material hereto, Novartis Defendants, either collectively or individually, designed, tested fabricated, formulated, processed, manufactured, distributed, marketed and sold the drug pimecrolimus, trademarked and marketed as Elidel, in Pennsylvania for purposes of treating various skin diseases.

13.      Novartis Defendants have substantial contacts and a presence in Pennsylvania including, but not limited to the fact that its employees, agents, sales representatives and/or independent contractors are citizens within Pennsylvania who are paid by Novartis Defendants, to act on their behalf, and who have power and authority to legally bind and obligate both companies to contracts and the laws of Pennsylvania.

---

[1] The "Novartis Group" refers to the ultimate parent company, Novartis AG and its some 360 affiliates in 140 countries.

3

14.    Defendant, Joe A. Sparks ("Sparks"), is a citizen of Pennsylvania. At all times material hereto, Defendant held himself out as a sales representative, employee, agent and/or detail person of Novartis Defendants for purposes of marketing, distribution, providing product information and giving out samples of pimecrolimus, to healthcare provides, including to Plaintiffs' treating physician, in the Commonwealth of Pennsylvania.

15.    Sparks also held himself out as a person with technical and specialized knowledge about pimecrolimus, for which he expected healthcare providers, including Plaintiffs' treating physician, to rely upon what he said and represented about pimecrolimus. Sparks, as a sales representative/detail person of Novartis Defendants, played a vital role in the distribution and marketing of pimecrolimus. He was a conduit for the technical and medically related information given to healthcare providers, including Plaintiffs' treating physician. Sparks also had a direct financial interest in the sale of pimecrolimus, since he was eligible for commissions based on the number of prescriptions written for pimecrolimus.

16.    In his capacity as an employee, sales representative, agent, and/or detail person, Sparks had as his job responsibilities to meet with healthcare providers authorized to treat patients in Pennsylvania, including Plaintiffs' treating physician for the express purpose of distributing, marketing, providing warnings, product information and making representations about the safety of pimecrolimus. In addition, Spark's job responsibilities and actions were intended to be an integral part of the distribution and marketing of pimecrolimus to healthcare providers by making representations and persuading them to write prescriptions on behalf of their patients in treatment of certain skin diseases. Finally, Sparks on a regular basis distributed and supplied healthcare providers, including Plaintiffs' treating physician,  with substantial quantities of pimecrolimus samples with the expectation that they would be given cost-free to

4

patients like Plaintiff, Andreas Perry, in an effort to increase sales, prescriptions, use and exposure to the drug.

17.     Defendant, Mary Gianstasio ("Gianstasio"), is a citizen of Pennsylvania. At all times material hereto, Defendant held herself out as a sales representative, employee, agent and/or detail person of Novartis Defendants for purposes of marketing, distribution, providing product information and giving out samples of pimecrolimus, to healthcare provides, including to Plaintiffs' treating physician, in the Commonwealth of Pennsylvania.

18.     Gianstasio also held herself out as a person with technical and specialized knowledge about pimecrolimus, for which she expected healthcare providers, including Plaintiffs' treating physician, to rely upon what she said and represented about pimecrolimus. Gianstasio, as a sales representative/detail person of Novartis Defendants, played a vital role in the distribution and marketing of pimecrolimus.  She was a conduit for the technical and medically related information given to healthcare providers, including Plaintiffs' treating physician.  Gianstasio also had a direct financial interest in the sale of pimecrolimus, since she was eligible for commissions based on the number of prescriptions written for pimecrolimus.

19.     In her capacity as an employee, sales representative, agent, and/or detail person, Gianstasio had as her job responsibilities to meet with healthcare providers authorized to treat patients in Pennsylvania, including Plaintiffs' treating physician, for the express purpose of distributing, marketing, providing warnings, product information and making representations about the safety of pimecrolimus.  In addition, Gianstasio's job responsibilities and actions were intended to be an integral part of the distribution and marketing of pimecrolimus to healthcare providers, including Plaintiffs' treating physician, by making representations and persuading them to write prescriptions on behalf of their patients in treatment of certain skin diseases.

Finally, Gianstasio on a regular basis distributed and supplied healthcare providers, including the Plaintiffs' treating physician, with substantial quantities of pimecrolimus samples with the expectation that they would be given cost-free to patients like Plaintiff, Andreas Perry, in an effort to increase sales, prescriptions, use and exposure to the drug.

20.     As used herein, Joe A. Sparks and Mary Gianstasio, shall be referred to collectively as "Sales Representative Defendants."

## JURISDICTION

21.     The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332 because the plaintiffs and the defendants are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

22.     NPC is subject to the jurisdiction of Pennsylvania in that this defendant committed tortious acts within the State.  NPC is further subject to jurisdiction in Pennsylvania based upon, but not limited to, transactions in Pennsylvania causing tortious injury to the Plaintiffs, and by their acts or omissions occurring outside Pennsylvania but injuring Plaintiffs within Pennsylvania.  Further, NPC engaged in or solicited business within Pennsylvania from which they derived substantial revenue from pimecrolimus, being sold, prescribed and used in Pennsylvania.

23.     Novartis Corp. is subject to the jurisdiction of Pennsylvania in that this defendant committed tortious acts within the State.  Novartis Corp. is further subject to jurisdiction in Pennsylvania based upon, but not limited to, transactions in Pennsylvania causing tortious injury to the Plaintiffs, and by their acts or omissions occurring outside Pennsylvania but injuring Plaintiffs within Pennsylvania.  Further, Novartis Corp engaged in or solicited business within

6

Pennsylvania, either directly or through its agent Defendant, NPC, and/or Sales Representative Defendants, from which they derived substantial revenue from pimecrolimus, being sold, prescribed and used in Pennsylvania.

24.      Pursuant to 42 Pa.C.S. § 5322 (2005) GmbH and NAG are subject to personal jurisdiction in Pennsylvania. GmbH and NAG, either directly or through its agents and/or alter-egos, NPC, Novartis Corp., and/or Sales Representative Defendants, designed, manufactured, formulated, prepared, tested, processed, distributed, marketed and sold pimecrolimus with the expectation that said product would be distributed, sold, marketed, prescribed and used in Pennsylvania.   In addition, they had the expectation that pimecrolimus would in fact be distributed, marketed, sold, prescribed and ultimately used by consumers in Pennsylvania.   As a result, GmbH and NAG have derived substantial income, revenue, and profits from Elidel sales within Pennsylvania.

## **FACTUAL BACKGROUND**

### **DRUG LABELING**

25.      Prescription drug labeling is required, among other things:

A.      To contain a summary of the essential scientific information needed for the safe and effective use of the drug (21 C.F.R. §201.56(a))[Effective until June 30, 2006.];

B.      To be informative and accurate and neither promotional in tone nor false or misleading in any particular (21 C.F.R. §201.56(b))[Effective until June 30, 2006];

C.      To be based whenever possible on data derived from human experience (21 C.F.R. § 201.56(c))[Effective until June 30, 2006] ; and

D.      To contain specific information under various section headings, including

7

Description, Clinical Pharmacology, Indications and Usage, Contraindications, Warnings, Precautions, Adverse Reactions, Drug Abuse and Dependence, Overdosage, Dosage and Administration, and How Supplied. (21C.F.R. §201.56(d)(1))[Effective until June 30, 2006.]

26.     The Warnings section heading listed in Section 201.56 [d] is required to describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. (21 C.F.R. §201.57(e))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

27.     The Warnings section heading listed in Section 201.56 [d] is required to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug, and a causal relationship need not have been proved.  (21 C.F.R. §201.57(e))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

28.     The Warnings section of the labeling shall identify any potentially fatal adverse reactions. (21 C.F.R. §201.57(g)(3))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

29.     The Warnings section heading listed in Section 201.56 [d] may be required by the Food and Drug Administration to include special problems, particularly those that may lead to death or serious injury, to be placed in a prominently displayed box. This prominently displayed box is commonly referred to as the "Black Box Warning".  (21 C.F.R. §201.57(e))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

30.     The Black Box Warning shall contain the frequency of these serious adverse reactions and, if known, the approximate mortality and morbidity rates for patients sustaining the reactions, which are important to safe and effective use of the drug, and shall be expressed as

provided under the "Adverse Reactions" section of the labeling. (21 C.F.R. §201.57(e))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

31.     An Adverse Reaction is an undesirable effect, reasonably associated with the use of the drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence. (21 C.F.R. §201.57(g))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

32.     The Adverse Reaction section shall list the adverse reactions that occur with the drug and with drugs in the same pharmacologically active and chemically related class. (21 C.F.R. §201.57(g)(1))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

33.     Adverse Reactions that are significantly more severe than the other reactions listed in a category shall be listed before those reactions, regardless of its frequency. (21 C.F.R. §Section 201.57(g)(2))[Redesigned as §201.80 at 71 FR 3922, 3988, Jan. 24, 2006, effective June 30, 2006.]

## THE MEDICATION

34.     NAG holds United States Patent number 5,912,238 for the substance known as pimecrolimus, which was developed as a topical immunosuppressant. In its patent application NAG cited to the patent application for the substance, tacrolimus, as supporting documentation.

35.     Pimecrolimus is a macrolide lactone antibiotic, initially developed under the name SDZ ASM 981 by Sandoz[2], and is the ethyl analog of another macrolide, tacrolimus. It was isolated from Streptomyces hygroscopius var. ascomyceticus (Ascomycin) and can also be

---

[2] In 1996 Ciba-Geigy, Ltd. merged with Sandoz Pharmaceuticals Corporation, Sandoz AG and Sandoz Pharma AG to form Novartis AG and its progeny. All documents related to the development and testing of SDZ ASM 981 thus were acquired by NAG and its progeny.

9

derived from Streptomyces Tsukubaensis.

36.     Pimecrolimus like tacrolimus, binds strongly to macrophilin-12 (FKBP-12) and also inhibits the calcium-dependent phoshatase called calcineurin. This binding results in inhibition of T cell activation by blocking the transcription of early cytokines. Both pimecrolimus and tacrolimus prevent the release of inflammatory cytokines and mediators from mast cells after stimulation by antigen/IgE and inhibit calcineurin. Hence the drugs are also known as calcineurin inhibitors.

37.     The United States Adopted Names Council (USAN), which is the national organization that assigns generic names. USAN has assigned both drugs the stem "imus" to their generic names. This indicates that USAN has concluded that these two drugs have similar pharmacological and/or chemical relationship. Thus, putting pimecrolimus and tacrolimus in the same drug classification as each other. When healthcare professionals such as physicians and pharmacists see the same stem "imus", they make the relationship that the two drugs are in the same pharmaceutical class, work in the body similarly, and have similar side effects.

## FROM NDA TO "BLACK BOX"

38.     On December 13, 2001, Novartis Defendants received Food and Drug Administration ("FDA") approval of its NDA for pimecrolimus, for the treatment of atopic dermatitis. The product had limited prescribing restrictions for its use and application including, for example, that it should not be prescribed for long term use and that it should only be used as a second-line therapy only after first-line treatments were ineffective or could not be used.

39.     Eczema is the clinical name for dermatitis, or "[s]uperficial skin inflammation, characterized histologically by epidermal edema and clinically by vesicles (when acute), poorly marginated redness, edema, oozing, crusting, scaling, usually pruritus, and lichenification caused

10

by scratching or rubbing." <u>The Merck Manual of Diagnosis and Therapy</u> 786 (Mark H. Beer, M.D. et al eds., 17th ed. 1999).

40.    Prior to the approval of topical preparations of theses drugs, calcineurin inhibitors had been approved for use as systemic immunosuppressants in organ transplant recipients.  In these patients, systemic treatment has long been known to increase the risk of malignancies and have carried appropriate Black Box Warnings.

41.    No later then December 2001, the Novartis Defendants knew the FDA was concerned of the potential for pediatric patients to develop systemic malignancies with intermittent use of pimecrolimus. The FDA expressed this concern in their approval letter to the Novartis Defendants.

42.    Because of these various concerns, the approval of pimecrolimus for treatment of atopic dermatitis in children included a post-marketing commitment from Novartis Defendants to conduct a registry study to asses the risk for developing cutaneous or systemic malignancies among pediatric patients who undergo intermittent treatment with these drugs.

43.    On October 30, 2003, an open meeting of the Pediatric Subcommittee of the Anti-Infective Drugs Advisory Committee was held to discuss how to approach long-term monitoring for malignancy occurrence, among patients treated for atopic dermatitis with pimecrolimus and tacrolimus.

44.    The subcommittee noted that the preclinical and clinical studies of both pimecrolimus and tacrolimus suggested these drugs may increase the risk of malignancies in the pediatric population.

45.    The subcommittee further stated that for children under 2; because of immune system development issues and lack of understanding regarding the development of other

11

systems in the very young, a Black Box Warning was recommended but never implemented.

46.     Following the close of the October 2003 subcommittee meeting, the adverse events relating to pimecrolimus and tacrolimus continued to increase.  Specifically, there were additional malignancy cases that had been reported to the FDA.

47.     Based on this concern the Pediatric Advisory Committee of the FDA convened, on February 14 & 15, 2005 again to discuss the potential malignancy risk from the use of pimecrolimus and tacrolimus.

48.     In March 2005, after accumulating scientific evidence of deaths, malignancies and other serious adverse events the FDA required Novartis Defendants to require a Black Box Warning of malignancy risks on pimecrolimus.

49.     In January 2006, the language to be included in the above mentioned Black Box was finally agreed to by and between the Novartis defendants and the FDA, and thereafter the Black box Warning was affixed to the pimecrolimus label.

## THE NOVARTIS DEFENDANTS

50.     From 2001 through the date of this complaint, the Novartis defendants generally, GmbH and NPC specifically, manufactured, labeled, packaged, distributed, supplied, marketed, advertised, and/or otherwise engaged in all activities that are part and parcel to the sale and distribution of a pharmaceutical, and by said activities, caused pimecrolimus to be placed into the stream of commerce throughout the United States, including the Commonwealth of Pennsylvania.

51.     The Novartis defendants, made, participated in and/or contributed to filings with the FDA in conjunction with the approval process for pimecrolimus in the United States.  As part of said activities, the Novartis defendants also engaged in "negotiations" with the FDA with

12

respect to the approval of the labeling, (also known as the "package insert" or "direction circular" to be approved for use with pimecrolimus).

52.     The Physician's Desk Reference ("PDR") contains the information from the product labeling as provided by the drug manufacturer.

53.     Upon information and belief the plaintiffs allege that the Novartis defendants, individually and collectively, were in control of the design, assembly, manufacture, marketing, distribution, packaging, labeling, processing, supplying, promotion, sales, and the issuance of product warnings and related information with respect to pimecrolimus.

54.     Pimecrolimus has been widely advertised, marketed and represented by the defendants as a safe and effective treatment for atopic dermatitis or eczema.

55.     The Novartis defendants were at all times material hereto subject to the laws of the United States of America, including provisions relating to the FDA, and the rules and regulations thereof, in conjunction with the approval process, labeling, and other after market activities that pertain to all pharmaceuticals, including pimecrolimus.

56.     Upon information and belief, the plaintiffs allege that pimecrolimus causes injury, including but not limited to malignancies and other serious health problems.

57.     To promote pimecrolimus and to increase the total market and sales of the drug, the Novartis defendants hired public relations, marketing, and advertising firms, provided promotional materials to sales forces, sponsored studies, hired ghost writers to publish papers in medical journals that supported the use of pimecrolimus, provided media contacts with promotional material, and in essence engaged in a widespread plan to market the use of pimecrolimus, thereby increasing sales and enlarging the market potential for pimecrolimus.

58.     In part due to the promotional efforts of the Novartis defendants, pimecrolimus

13

was so pervasively prescribed throughout the United States that, by 2005, the number of prescriptions in the United States totaled in the millions.

59.    As early as 2001, and up through and including 2005, the package insert for pimecrolimus failed to provide any WARNINGS for malignancies in association with the use of pimecrolimus.

60.    In fact, Novartis defendants had known at all times material, that physicians more often read the WARNINGS portion of the PDR rather than any other section, and certainly much more often than they read the PRECAUTIONS section.

61.    As early as 2001, and up through and including 2005, absolutely no information regarding malignances had ever been included in the WARNINGS section of the product labeling for pimecrolimus. In fact no information regarding malignancies whatsoever was provided in the PRECAUTIONS section of the PDR either.

62.    The Novartis defendants also knew that because both pimecrolimus and tacrolimus belonged to the same class of drugs, i.e. calcineurin inhibitors, that any adverse event applicable to one would be applicable to the other.

63.    Despite their knowledge of the potentially life threatening diseases associated with increased use of their pimecrolimus, the Novartis defendants engaged in a marketing and advertising program, which as a whole, by affirmative and material misrepresentations and omissions, falsely, fraudulently, and criminally sought to create the image and impression that the use of pimecrolimus was safe for human use, had fewer side effects and adverse reactions than other methods of treating eczema, and would not result in a side effect that was potentially fatal.

64.    The Novartis defendants falsely and fraudulently kept relevant information from

14

prescribing physicians and potential pimecrolimus users in order to minimize user and prescriber concern regarding the safety of the drugs.

65.     The Novartis defendants, individually and collectively, purposefully downplayed and understated the health hazards and risks associated with the use of pimecrolimus, and, through promotional literature as well as sales visits to prescribing physicians, deceived prescribing physicians and potential users of pimecrolimus by relaying positive information, and manipulating statistics to suggest widespread acceptability, while concealing the nature and extent of known adverse and serious health effects.

66.     The information produced and disseminated by and on behalf of the Novartis defendants, falsely and fraudulently misrepresented a number of facts regarding pimecrolimus, including, but not limited to, the existence of adequate testing of pimecrolimus, and the nature, severity, and frequency of side effects and adverse health effects caused by pimecrolimus.

67.     Prior to January 19, 2006, no WARNINGS were listed in the pimecrolimus listing in the various PDR's in effect during the pre-market period, up to the publication and distribution of the 2005 issue, and the initial product labeling for pimecrolimus, to alert prescribing physicians as well as consumer patients of the actual risks associated with this drug, including the risk of potentially fatal malignancies, and the extent or actual risk thereof, notwithstanding the fact that the Novartis defendants, individually and collectively, knew that reasonable evidence of an association between the use of pimecrolimus and such conditions existed.

68.     The Novartis defendants were acutely aware of how physicians reacted to what was included in the product labeling, how the labeling would impact upon physician's prescribing patterns, and the methods that could be employed to minimize physician awareness

15

of certain side-effects or to make such side-effects more readily apparent to the reader of the labeling. In fact, the Novartis defendants knew that physicians paid much closer attention to the WARNINGS section of product labeling than any other section. Also information contained in the WARNINGS section, and the manner and method of how it was displayed ultimately affected the physician's willingness to prescribe the pharmaceutical, in this case, pimecrolimus.

69.     The Novartis defendants, individually and collectively, notwithstanding access to information establishing the aforementioned dangers associated with the use of pimecrolimus specifically and, immunosuppressants generally, promoted the use of pimecrolimus as an effective treatment for eczema without offering timely supplements to their warnings and product information to fully, completely and/or adequately advise prescribing physicians and potential consumers of the very real risks and side effects, especially that of malignancies.

70.     The Novartis defendants failed to timely and appropriately amend, change, alter or otherwise update the product labeling, package insert, or to otherwise advise physicians, patients, pharmacists, or other health care providers of the risk of developing malignancies, and intentionally hid the data and information regarding the aforementioned danger associated with the use of pimecrolimus, for the sole and exclusive purpose of ensuring that their product, would be approved by the FDA, and  ultimately increase profits of the Novartis defendants.

71.     Nevertheless, the Novartis defendants negligently and intentionally failed to fully or adequately warn and apprize prescribing physicians, as well as the consumer public, including the plaintiff, Andreas Perry, and his physicians, that there was any risk of developing malignancies.

72.     In addition, the Novartis defendants failed to adequately or completely warn the prescribing physicians and the consumer public, including the plaintiff, Andreas Perry, about the

16

special risks of developing malignancies (and other problems) associated with pimecrolimus, of which use the said defendants, individually and collectively, were well aware.

73.    Furthermore, the Novartis defendants knew about the malignancies associated with immunosuppressants such as pimecrolimus *even before* they did the first test on a rat for their investigational new drug application to the FDA, by virtue of their experience with similar drugs in organ transplant patients, and similar topical immunosuppressants/calcineurin inhibitors already on the worldwide market.

74.    As a direct and proximate result of the failures of the Novartis defendants to fully, completely, adequately and appropriately disclose the aforesaid information to prescribing physicians in the United States, including the Commonwealth of Pennsylvania, physicians had been prescribing and over-prescribing pimecrolimus to patients, and both prescribing physicians and the consumer public, including the plaintiff, Andreas Perry, had been grossly under-informed regarding the risks of serious health effects, including malignancies, which were clearly reported and/or known to be associated with immunosuppressant drugs.

75.    Despite knowing of an increased incidence of malignancies beyond what was reported to physicians in product labeling and in the PDR, and the Novartis defendants enjoying markedly increased sales of pimecrolimus, the said defendants consciously and with full knowledge and intent, deprived the general public and physicians of such knowledge.  In fact, the Novartis defendants, through an intentional lack of action knowingly decided not to include Warnings of adverse events regarding malignancies, or to send physicians any "Dear Doctor" letters, or to otherwise alert the health care profession, for fear that it could limit the growth potential of the drug.

17

## FACTUAL ALLEGATIONS – ANDREAS PERRY'S CASE

76.     Prior to May 2003, the treating physician as well as the Plaintiff's mother, Andrea Perry, were exposed to the aforementioned advertising and marketing campaign directly by the Defendants and became interested in pimecrolimus, more commonly known as Elidel.

77.     The plaintiffs' physicians and mother, Andrea Perry, either through direct promotional contact with Sales Representative Defendants, through word of mouth from other health care providers, or through promotional materials, received the information the Defendants intended that they receive, to-wit: that Elidel was "steroid-free," safer then corticosteroids, had very little side effects and could be used as first-line therapy.

78.     Having heard of Elidel as a safer alternative for the treatment of eczema, on or about April 30, 2003, the plaintiff's mother presented her child, Plaintiff, Andreas Perry, to a physician for the purposes of treating her son's eczema.  At that time, the physician performed a physical examination which found the plaintiff, Andreas Perry, to be suffering from eczema. The plaintiff's mother was given samples of Elidel and directed to apply the topical as indicated.

79.     As a direct and proximate result of the use and application of pimecrolimus, Plaintiff, Andreas Perry, suffered serious bodily injury and harm, including being diagnosed with a malignancy, more specifically lymphoblastic lymphoma.

80.     At no time material to his use of pimecrolimus, was Plaintiff, Andreas Perry, told, warned or given information about the risks of developing malignancies caused by the use of pimecrolimus.

81.     As a result of the aforementioned acts and conduct, the Plaintiff, Andreas Perry, has suffered grievous personal harm and related damages.

18

## Discovery Rule and Fraudulent Concealment

82.     The nature of Plaintiff, Andreas Perry's, injuries and their relationship to pimecrolimus use were inherently undiscoverable; and, consequently, the discovery rule should be applied to the running of the statute of limitations.  The causes of action arising from Andreas Perry's usage of pimecrolimus did not and could not have accrued prior the date of his injury because Plaintiffs did not know and could not have known through the exercise of reasonable care and diligence of the existence of Plaintiffs' claims against Defendants.

83.     Further, prior to the date of Andreas Perry's injuries, Plaintiffs did not have knowledge of facts that would lead a reasonable, prudent person to make inquiry to discover Defendants' tortious conduct.  Under appropriate application of the "discovery rule," Plaintiffs' suit was filed within the applicable statutory limitations period because Plaintiffs filed this lawsuit within two (2) years from the date of Plaintiffs' discovery of the cause of their son's injury and their damages.

84.     Moreover, Defendants fraudulently concealed from Plaintiffs the nature of the injury and the connection between the injury and pimecrolimus.

## Count I – Strict Products Liability – Defective Design
## Against Novartis Defendants

85.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1 - 84 above.

86.     Novartis Defendants, directly or indirectly made, created, manufactured, assembled, designed, sterilized, tested, labeled, supplied, packaged, distributed, marketed, advertised, warned, and/or sold, the drug pimecrolimus in the Commonwealth of Pennsylvania.

87.     Pimecrolimus, marketed by the Novartis Defendants as Elidel, at the time it left

19

the control, possession and custody of the Novartis Defendants was in a condition which rendered it unreasonably and inherently dangerous for use by ultimate consumers generally and by Plaintiffs specifically.

88.     Pimecrolimus at the time it left the control, possession and custody of the Novartis Defendants was defective in that a reasonable consumer would not expect that the drug would have serious adverse consequences, events and health risks related to it, including but not limited to development of malignancies and suppression of the body's natural immune system which resulted in other serious health problems and diseases.  At all times material to this action, pimecrolimus was unreasonably dangerous because of its design, formulation, and manufacture as it failed to perform as safely as an ordinary consumer would expect, when used as intended or in a manner reasonably expected by the Novartis Defendants.

89.     This drug product was defective and unreasonably dangerous when said product left the possession of Novartis Defendants, in that:

(a)     When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting Plaintiffs to risks which exceeded the benefits of the drug;

(b)     When placed in the stream of commerce, the drug product was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with atopic dermatitis;

(c)     Pimecrolimus contained insufficient warnings to alert consumers and users to the risks of developing malignancies and other injuries, harms and dangers;

(d)     The drug product was insufficiently tested;

20

(e)     There were insufficient instructions on the proper use of the drug;

(f)     There was misleading advertising and over-promotion concerning the benefits of using the drug;

(g)     There was inadequate post-marketing warnings or instructions because, after the Novartis Defendants, knew or should have known of the significant risks of developing malignancies and other injuries, harms and dangers, from the use of pimecrolimus, the Novartis Defendants failed to provide adequate warnings to users or consumers and continued to promote the sale and use of said drug;

(h)     They sold a product which was not safe for its intended use;

(i)     They sold a product wherein it was foreseeable that someone would be injured upon application of the drug in question;

(j)     They sold a product which was lacking in one or more elements necessary to make it safe for its intended use;

(k)     They manufactured a product which was defective and could cause injury to the user;

(l)     They designed a product which was defective and which could cause injury to the user;

(m)     They distributed a product which was defective and could cause injuries to a user;

(n)     They failed to see that ultimate users were advised of the dangers of said product;

(o)     They failed to exercise reasonable care in the design and manufacturing of said product;

21

(p)     They produced a product with components that they knew or should have known would increase the risk of harm to users, and

(q)     Pimecrolimus had not been materially altered or modified prior to the use of said drug by Plaintiffs.

90.     Plaintiffs used pimecrolimus for its intended purposes, i.e., the treatment of atopic dermatitis.

91.     Plaintiffs could not have discovered any defect in the drug product through the exercise of care.

92.     As a direct and proximate result of Novartis Defendants' negligence, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses.  Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

93.     In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive

22

damages, interest and allowable costs of suit.

## Count II - Negligence
## Against Novartis Defendants

94.     Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

95.     Novartis Defendants, directly or indirectly, negligently and/or defectively made, created, manufactured, assembled, designed, sterilized, tested, labeled, supplied, packaged, distributed, promoted, marketed, advertised, and/or sold pimecrolimus in the Commonwealth of Pennsylvania.

96.     At all times material to this action, Novartis Defendants as the designers, manufacturers, distributors, processors, formulators, sellers, marketers and suppliers of pimecrolimus, owed a duty to Plaintiffs and other patients to exercise reasonable care in the design, manufacture, formulation, testing, sale, marketing and distribution of pimecrolimus.

97.     Novartis Defendants had a duty to exercise reasonable care that pimecrolimus, was safe, efficacious, and free from all known, or what they should have known to be severe adverse events, including the risk of malignancies, from its use by Plaintiffs.

98.     Novartis Defendants knew, or in the exercise of reasonable care should have known, that pimecrolimus caused serious and potentially severe adverse events, consequences and reactions when used and applied, even in accordance with defendants' instructions, by patients such as Plaintiff, Andreas Perry.   These serious and/or potentially severe health consequences included, but were not limited to, malignancies and other harmful diseases and illnesses.

23

99.     Novartis Defendants breached the duty owed to Plaintiffs and acted negligently in its actions and representations toward Plaintiffs in the following manner:

(a)     Failed to include adequate warnings with the drug that would alert consumers and physicians to the potential risks and serious side effects of the drug;

(b)     Filed to adequately and properly test the drug before placing the drug on the market;

(c)     Failed to conduct sufficient testing on the drug, which if properly performed, would have shown that the drug has serious side effects;

(d)     Failed to adequately warn Plaintiffs that the use of pimecrolimus carried a risk of temporary or permanent disability;

(e)     Failed to warn Plaintiffs that the use of the drug carried a risk of malignancy;

(f)     Failed to provide adequate post-marketing warnings or instructions after they knew or should have known of the significant risks associated with the use and application of pimecrolimus; and

(g)     Encouraged the used or over use of pimecrolimus while representing the side effects in an understated manner to physicians and the public in order to gain profits from sales of pimecrolimus.

100.    Novartis Defendants knew or should have known that pimecrolimus caused unreasonably dangerous risks and serious side effects of which Plaintiffs could not and would not be aware; Novartis Defendants nevertheless advertised, marketed, sold and distributed the drug pimecrolimus knowing that there were safer methods and alternatives for the treatment of atopic dermatitis.

24

101.    As a direct and proximate result of Novartis Defendants' negligence, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses.  Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

102.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

WHEREFORE, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count III – Deceit and Fraud
### By Novartis Defendants

103.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

104.    As early as 1999, Novartis Defendants had specific knowledge about serious adverse events, reactions, defects, health risks, unreasonable and inherent dangers and consequences posed by the use and application of pimecrolimus, including the development of

malignancies. These dangers and health risks were known by Novartis Defendants based upon scientific evidence, their own research, post-marketing adverse events, clinical studies, animal studies, and secret studies conducted which were not made public. Despite possessing this knowledge, Novartis Defendants intentionally misrepresented the safety of pimecrolimus, by representing the drug did not impose any undue, inherent or serious health risks to persons who were prescribed the product and/or given samples by their healthcare providers.

105.    Additionally, Novartis Defendants intentionally misrepresented the safety of pimecrolimus, through its product brochures, product inserts, information and by oral presentations made by its employees to Plaintiffs' treating physician.

106.    These misrepresentations about the safety and efficacy of pimecrolimus, included the fact that the drug did not pose any unreasonable or inherent health risks to patients to whom it was prescribed or given samples; being steroid-free it was completely safe, and safer than topical corticosteroids; there was no risk of malignancy associated with the use and application of pimecrolimus; and it was safe to be used as a first-line therapy of treatment when in fact the drug was only intended to be a second-line therapy.

107.    Despite the knowledge of Novartis Defendants to the contrary, they misrepresented information both orally and in writing to healthcare providers, including Plaintiffs' treating physician, about the safety of the product. Novartis Defendants intentionally misrepresented pimecrolimus as safer than topical corticosteroids, for the express purpose of having physicians, including Plaintiffs' treating physician, prescribe the product and give out samples. Novartis Defendants intentionally misrepresented to healthcare providers the lack of serious health and malignancy risks resulting from the use and application of pimecrolimus, knowing there would be reliance on these misrepresentations in making decisions on prescribing

26

pimecrolimus.

108.    These misrepresentations by Novartis Defendants were material in that they involved statements about the safety and efficacy associated with pimecrolimus. Novartis Defendants intended that treating healthcare physicians, including Plaintiffs' treating physician, would rely on these misrepresentations which they knew to be false, or which were made in a reckless manner.

109.    Novartis Defendants intentionally failed to inform Plaintiffs regarding the fact that clinical trials conducted by Novartis Defendants showed an increased risk of malignancies with the use of pimecrolimus.

110.    Since the beginning of their marketing campaign and in April 2003 when pimecrolimus, was given to Plaintiff, Andreas Perry, Novartis Defendants made material misrepresentations that the drug had been clinically and laboratory tested and medically proven safe. As set forth above, Novartis Defendants misrepresented that their product was appropriate as a first-line therapy and that it was safe, effective, and well tolerated for patients such as Plaintiff, Andreas Perry, when in fact it was not. At the time the misrepresentations were made to Plaintiffs in April 2003 upon Plaintiffs' initial use of pimecrolimus, they were false and Novartis Defendants knew they were false.

111.    Plaintiffs reasonably relied upon such representations in deciding to begin using Novartis Defendants' product in April 2003 and, but for such representations of safety and appropriateness, they would not have used it.

112.    Specifically, Plaintiffs were informed and told, through their treating physician, as the conduit for Novartis Defendants that pimecrolimus was a safer alternative to corticosteroids and safe to use as a first-line therapy for their child's skin condition. In April

27

2003, Plaintiffs were given samples of pimecrolimus.  No information regarding any serious adverse events or other serious risks associated with pimecrolimus were relayed to Plaintiffs.

113.    Upon information and belief, Novartis Defendants, were aware that malignancies were identified as a serious adverse event for pimecrolimus, as early as 1999.

114.    Despite possessing such knowledge, Novartis Defendants marketed the product without a warning from the beginning of its marketing campaign and in April 2003, when pimecrolimus, was first given to Plaintiff.

115.    As stated above, this omission was material and induced Plaintiffs to use Novartis Defendants' product. If they had been told that pimecrolimus could cause malignancies, they would have been in better position to make a more fully informed decision to use or not use the product.

116.    The misrepresentations and omissions set forth above were done with the knowledge that the misrepresentations were false when made.

117.    As a direct and proximate result of the intentional misrepresentations as set forth above, Plaintiffs applied pimecrolimus, to their infant son which ultimately resulted in his diagnosis of Lymphoblastic Lymphoma.

118.    As a direct and proximate result of Novartis Defendants' deceit and fraud, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses.  Plaintiff, Andreas Perry's, physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to

compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

119.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count IV – Strict Products Liability – Failure to Warn
### Against Novartis Defendants

120.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

121.    Pimecrolimus was defective and unreasonably dangerous when it left the possession of Novartis Defendants in that the drug contained warnings insufficient to alert Plaintiffs and/or physicians to the dangerous risks and reactions associated with the drug, including but not limited to developing malignancies and other serious injuries, harms and dangers.

122.    Plaintiffs used the drug pimecrolimus for its intended purposes, i.e., the treatment of atopic dermatitis.

123.    Plaintiffs could not have discovered any defect in the drug product through the exercise of care.

124.    Novartis Defendants, as manufacturers of a prescription drug, are held to the level

29

of knowledge of an expert in the field.

125.    The treating physician herein did not have substantially the same knowledge as an adequate warning from the manufacturer or distributor should have communicated to the treating physician.

126.    The warnings that were given by the Novartis Defendants, to the treating physician were not accurate, not clear and/or were ambiguous.

127.    Novartis Defendants had a continuing duty to warn the Plaintiffs and/or the treating physician of the dangers associated with the drug in question.

128.    As a direct and legal result of the defective condition of the drug, Plaintiffs have sustained serious and permanent injuries including, but not limited to malignancies, other physical and emotion injuries, serious adverse events and other health problems.

129.    Novartis Defendants had a duty to provide adequate warnings with their product pimecrolimus, including to ensure that adequate warnings were provided to healthcare providers, including Plaintiffs' treating physician, concerning the safety and any health risks known or should have been known resulting from the use and application of pimecrolimus.

130.    Novartis Defendants breached their duty by failing to use reasonable care in providing adequate warnings to healthcare providers, including to Plaintiffs' treating physician, about the serious adverse health risks caused by pimecrolimus. Specifically, Novartis Defendants failed to adequately warn Plaintiffs and/or their treating physician, there were more severe health risks in using pimecrolimus, then more traditional treatments for the type of skin disease that Plaintiff, Andreas Perry, had.

131.    Novartis Defendants had knowledge that pimecrolimus, since at least as early as the year 1999 posed serious adverse health risks of malignancies to patients who would use and

apply pimecrolimus, for the treatment of skin diseases to which the product was designed to treat. Novartis Defendants failed to warn Plaintiffs or their treating physician, of these health risks.

132.    Novartis Defendants, as the designers, manufacturers, distributors, marketers and sellers of pimecrolimus, were in a superior position to that of Plaintiffs, or their treating physician, and other healthcare providers, to have knowledge about these serious adverse health risks posed by pimecrolimus, including the risk of malignancies. Defendants failed to adequately warn Plaintiffs' treating physician so that they could make an appropriate, informed, and independent judgment with respect to what drug to use in the treatment of Plaintiff, Andreas Perry.

133.    As a result of Novartis Defendant's failure to adequately warn healthcare providers about the serious health risks posed by pimecrolimus, including developing malignancies, Plaintiffs' treating physician gave numerous samples of pimecrolimus to Plaintiffs.

134.    Had Novartis Defendants adequately warned Plaintiffs and/or their treating physician of the serious health risks posed by using pimecrolimus, Plaintiffs would have been in better position to make a more fully informed decision to use or not use the product.

135.    As a direct and proximate result of Novartis Defendants' failure to warn, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to

31

compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

136.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count V – Fraud and Deceit
### Against Joe A. Sparks and Mary Gianstasio

137.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

138.    No later then April 2003, Sales Representative Defendants, knew or should have known about serious adverse events, reactions, defects, health risks, unreasonable and inherent dangers and consequences posed by the use and application of pimecrolimus, including the development of malignancies.

139.    These dangers and health risks were known by the Sales Representative Defendants based upon scientific evidence, research, post-marketing adverse event, clinical studies, animal studies, and secret studies conducted by Novartis Defendants, relayed to the Sales Representative Defendants which were not made public.

140.    Despite possessing this specialized knowledge, the Sales Representative Defendants, intentionally misrepresented the safety of pimecrolimus by representing the drug did

32

not impose any undue, inherent or serious health or safety risks to persons who were prescribed the product and/or given samples by a healthcare provider.

141.   Upon information and belief, the Sales Representative Defendants intentionally misrepresented the safety of pimecrolimus through the distribution of product brochures, product inserts, information, and by oral presentations about the product's safety made to Plaintiffs' treating physician and Plaintiff, Andrea Perry, herself, which the Sales Representative Defendants knew not to be true.

142.   These misrepresentations about the safety of pimecrolimus included that the drug did not pose any unreasonable or inherent health risks to patients to whom it was prescribed or given samples; being steroid-free it had no safety risks and was safer than topical corticosteroids; there was no risk of malignancies associated with the used and application of pimecrolimus; the drug was safe to be used as a first-line therapy when in fact the drug was only intended to be a second-line therapy; and finally that pimecrolimus was safe for intermittent use when in fact it was not.

143.   Despite knowledge of the Sales Representative Defendants to the contrary, they misrepresented information both orally and in writing to healthcare providers, including the Plaintiff's treating physician and Plaintiff, Andrea Perry, herself, about the safety of pimecrolimus. The Sales Representative Defendants intentionally misrepresented pimecrolimus safer then alternative treatments, for the express purposes of having physicians prescribe the product and give out samples to their patients who were diagnosed with the type of disease that pimecrolimus was intended and designed to treat.   The Sales Representative Defendants intentionally misrepresented to healthcare providers, information about the lack of serious health and malignancy risks resulting from the use and application of pimecrolimus, knowing there

33

would be reliance on these misrepresentations in marketing decision to prescribe pimecrolimus for patients, or providing samples of the same.

144.    These misrepresentations by the Sales Representative Defendants were material in that they involved statements about the safety and efficacy of pimecrolimus. The Sales Representative Defendants intended treating healthcare providers would rely on these representations which the Sales Representative Defendants knew to be false, or which were made in a reckless manner. In this case, Plaintiffs obtained samples based upon the misrepresentations of the Sales Representative Defendants.

145.    As stated above, this omission was material and induced Plaintiffs to use pimecrolimus. If they had been told that pimecrolimus could cause malignancies, they would have been in better position to make a more fully informed decision to use or not use the product.

146.    The misrepresentations and omissions set forth above were done with the knowledge that the misrepresentations were false when made.

147.    As a direct and proximate result of the intentional misrepresentations as set forth above, Plaintiffs applied pimecrolimus to their infant son which ultimately resulted in injury.

148.    As a direct and proximate result of the Sales Representative Defendants' deceit and fraud, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to

34

further health problems, physical ailments, and serious adverse events.

149.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

WHEREFORE, Plaintiffs claim of Defendants, Joe A. Sparks and Mary Gianstasio, compensatory damages, punitive damages, interest and allowable costs of suit.

## Count VI – Intentional and Negligent Infliction of Emotional Distress Against Novartis Defendants

150.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

151.    Novartis Defendants engaged in the conduct described above and willfully, recklessly and/or negligently caused Plaintiffs severe emotional distress as set forth in Restatement (Second) of Torts, §46(1) and Bosley v. Andrews, 142 A.2d 263 (Pa. 1958).

152.    The conduct of Novartis Defendants in making false statements to the FDA and the general public; knowing the public and physicians would rely on these statements in deciding whether to allow an infant to take pimecrolimus, which Novartis Defendants knew had a highly increased adverse event rate, and which ultimately and directly resulted in Plaintiff, Andreas Perry's lymphoblastic lymphoma; has caused emotional harm to Plaintiffs, Andreas Perry, Andrea Perry and George Perry, and was extreme and outrageous.

153.    Plaintiffs have all suffered severe emotional distress as a result of the conduct of Novartis Defendants.

35

154.    Novartis Defendants' actions were willful and/or reckless thus entitling Plaintiffs to punitive damages.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count VII – Common Law Fraud
### Against Novartis Defendants

155.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

156.    Novartis Defendants made the following intentional misrepresentations as established by Restatement (Second) of Torts, §§252-552 and in; among of them:

(a)    Negligently and recklessly misrepresenting the risks of prescribing pimecrolimus, to infants such as Plaintiff, Andreas Perry; and

(b)    Negligently and recklessly failing to inform Plaintiffs regarding the fact that studies clearly indicated that pimecrolimus, showed an increased risk malignancies.

157.    The negligent and reckless misrepresentations set forth above were done to induce Plaintiffs to apply pimecrolimus.

158.    Such negligent and reckless misrepresentations by Novartis Defendants concerning the increased risk of malignancies associated with the application of pimecrolimus, constituted an omission of a material fact.

159.    The misrepresentations and omissions set forth were done with the knowledge that the misrepresentations were false when made.

160.    Plaintiffs justifiably relied upon the misrepresentations and omissions set forth above in making the decision as to whether to apply pimecrolimus.

36

161.    As a direct and proximate result of the Novartis Defendants' negligent and reckless material misrepresentations as set forth above, Plaintiff, Andreas Perry, was diagnosed with lymphoblastic lymphoma as a direct result of the application of pimecrolimus.

162.    As a direct and proximate result of Novartis Defendants' negligence, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

163.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count VIII - Common Law Fraud
### Against Joe A. Sparks and Mary Gianstasio

164.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

37

165.    Defendants, Joe A. Sparks and Mary Gianstasio, made the following intentional misrepresentations as established by Restatement (Second) of Torts, §§252-552 and in; among of them:

(a)    Negligently and recklessly misrepresenting the risks of prescribing pimecrolimus, to infants such as Plaintiff, Andreas Perry; and

(b)    Negligently and recklessly failing to inform Plaintiffs regarding the fact that studies clearly indicated that Pimecrolimus, showed an increased risk of malignancies.

166.    The negligent and reckless misrepresentations set forth above were done to induce Plaintiffs to apply pimecrolimus.

167.    Such negligent and reckless misrepresentations by these Sales Representative Defendants concerning the increased risk malignancies associated with the application of pimecrolimus, constituted an omission of a material fact.

168.    These misrepresentations and omissions set forth were done with the knowledge that the misrepresentations were false when made.

169.    Plaintiffs justifiably relied upon the misrepresentations and omissions set forth above in making the decision as to whether Plaintiffs would apply pimecrolimus.

170.    As a direct and proximate result of the Sales Representative Defendants' negligent and reckless material misrepresentations as set forth above, Plaintiff, Andreas Perry, was diagnosed with lymphoblastic lymphoma as a direct result of the use and application of pimecrolimus.

171.    As a direct and proximate result of Sales Representatives Defendants' fraud, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages,

38

pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

172.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Defendants, Joe A. Sparks and Mary Gianstasio, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count IX – Breach of Express Warranty (13 Pa. C.S.A. § 2313) Against Novartis Defendants

173.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

174.    Novartis Defendants expressly represented to the users and their physicians that pimecrolimus, was safe and fit for use for the purposes intended, that it was of merchantable quality, and that it did not produce any side-effects dangerous to life, and it was adequately tested and fit for its intended purpose.

175.    Members of the medical community in general and Plaintiffs' treating physician

in particular, relied upon the representations and warranties of Novartis Defendants for use and application of pimecrolimus, in prescribing, recommending and/or dispensing pimecrolimus.

176.    Novartis Defendants knew or should have known that said representations and warranties were false, misleading and untrue in that pimecrolimus was not safe and fit for the use intended, and in fact, produces serious injuries and/or death to the user.

177.    As a result of the aforementioned breach of warranties as set forth by 13 Pa. C.S.A. § 2313 by Novartis Defendants, Plaintiff, Andreas Perry, was diagnosed with lymphoblastic lymphoma.

178.    As a direct and proximate result of Novartis Defendants' breach of warranty, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses.  Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

179.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive

damages, interest and allowable costs of suit.

### Count X - Breach of Express Warranty (13 Pa. C.S.A. § 2313)
### Against Joe Sparks and Mary Gianstasio

180.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

181.    Sales Representative Defendants expressly represented to the users and their physicians that pimecrolimus, was safe and fit for the use for the purposes intended, that it was of merchantable quality, that it did not produce any side-effects dangerous to life, and it was adequately tested and fit for its intended use.

182.    Members of the medical community in general and Plaintiffs' treating physician in particular relied upon the representations and warranties of these Sales Representative Defendants for use and application of pimecrolimus, in prescribing, recommending and/or dispensing pimecrolimus.

183.    The Sales Representative Defendants expressly stated to Plaintiffs that pimecrolimus, was safe as a first-line therapy.

184.    The Sales Representative Defendants knew or should have known that said representations and warranties were false, misleading and untrue in that pimecrolimus was not safe and fit for the use intended, and, in fact, produces serious injuries and/or death to the user.

185.    As a result of the aforementioned breach of warranties as set forth by 13 Pa. C.S.A. § 2313 by the Sales Representative Defendants, Plaintiff, Andreas Perry, was diagnosed with lymphoblastic lymphoma.

186.    As a direct and proximate result of Sales Representative Defendants' breach of warranty, Plaintiffs have sustained serious and permanent injuries, including but not limited to,

41

damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

187.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Defendants, Joe A. Sparks and Mary Gianstasio, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count XI - Breach of Implied Warranty (13 Pa.C.S.A. §2314-§2315) Against Novartis Defendants

188.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

189.    Novartis Defendants impliedly represented to the users and their physicians that pimecrolimus, was safe and fit for use for the purposes intended, that it was of merchantable quality, and that it did not produce any side-effects dangerous to life, and that it was adequately tested and fit for its intended purpose.

190.    Members of the medical community in general and Plaintiffs' treating physician

in particular relied upon the representations and warranties of Novartis Defendants for use and effects of pimecrolimus, in prescribing, recommending and/or dispensing pimecrolimus.

191.    Novartis Defendants knew or should have known that said representations and warranties were false, misleading and untrue in that pimecrolimus was not safe and fit for its intended use, and in fact, produces serious injuries and/or death to the user.

192.    As a result of the aforementioned breach of warranties by Novartis Defendants as set forth in 13 Pa.C.S.A. §2314-§2315, Plaintiff, Andreas Perry, was diagnosed with lymphoblastic lymphoma as a direct and proximate result of his use of pimecrolimus.

193.    As a direct and proximate result of Novartis Defendants' breach of implied warranty, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies.  Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

194.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive

43

damages, interest and allowable costs of suit.

<u>Count XII - Breach of Implied Warranty (13 Pa.C.S.A. §2314-§2315)</u>
<u>Against Joe A. Sparks and Mary Gianstasio</u>

195.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

196.    Sales Representative Defendants, impliedly represented to the users and their physicians that pimecrolimus, was safe and fit for use for the purposes intended, that it was of merchantable quality, and that it did not produce any side-effects dangerous to life, and that it was adequately tested and fit for its intended purpose.

197.    Members of the medical community in general and Plaintiffs' treating physician in particular relied upon the representations and warranties of the Sales Representative Defendants for use and effects of pimecrolimus, in prescribing, recommending and/or dispensing pimecrolimus.

198.    The Sales Representative Defendants knew or should have known that said representations and warranties were false, misleading and untrue in that pimecrolimus, was not safe and fit for its intended use, and, in fact, produces serious injuries and/or death to the user.

199.    As a result of the aforementioned breach of warranties by these Sales Representative Defendants as set forth in 13 Pa.C.S.A. §2314-§2315, Plaintiff, Andreas Perry, was diagnosed with lymphoblastic lymphoma as a direct and proximate result of his use of pimecrolimus.

200.    As a direct and proximate result of Sales Representative Defendants' breach of implied warranty, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological

44

injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

201.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

*WHEREFORE*, Plaintiffs claim of Defendants, Joe A. Sparks and Mary Gianstasio, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count XIII – Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (73 Pa. C.S.A. §§201-1 - 201-9.1) Against Novartis Defendants

202.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

203.    Novartis Defendants are merchants with respect to its sale of the drug pimecrolimus.

204.    Novartis Defendants knowingly committed unfair and deceptive trade practices in its designing, manufacturing, promoting, selling and marketing of pimecrolimus, to the consuming public.

205.    When Novartis Defendants were designing, marketing, manufacturing, testing and

45

selling pimecrolimus, they knew or reasonably should have known that pimecrolimus, substantially increases the risk of malignancies.

206.    At no time did Novartis Defendants inform or disclose to the FDA or to the general public of its knowledge concerning the dangers associated with the application and usage of pimecrolimus.

207.    Novartis Defendants also failed to give adequate warnings regarding the use and potential problems with pimecrolimus.

208.    Novartis Defendants' actions complained of herein occurred in the conduct of trade or commerce, and off of the conduct alleged herein occurred in the course of Novartis Defendants' business.

209.    Through their marketing promoting and manufacturing of pimecrolimus, Novartis Defendants intended to and did in fact deceive consumers, by leading consumers to believe that pimecrolimus, was a merchantable, viable and warrantable drug to be used by the general public, including infants.

210.    By reason of the foregoing, Novartis Defendants' conduct represents unfair acts and/or practices that have the capacity to, has, and continues to deceive consumers.

211.    Novartis Defendants' Conduct constitutes an unfair and deceptive trade practice under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL).

212.    As a direct and proximate result of these unfair and deceptive trade practices, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses.  Plaintiff, Andreas

46

Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

213.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for medical care and related treatment for said injuries, and will continue to suffer loss or impairment of the capacity for the enjoyment of life.

WHEREFORE, Plaintiffs claim of Novartis Defendants, compensatory damages, punitive damages, interest and allowable costs of suit.

### Count XIV – Negligence
### Against Joe A. Sparks and Mary Gianstasio

214.    Plaintiffs incorporate herein by reference and re-assert the allegations contained in paragraphs 1-84 above.

215.    Sales Representative Defendants were in the business of marketing, promoting, selling and/or distributing pimecrolimus in the Commonwealth of Pennsylvania.

216.     The Sales Representative Defendants owed various duties to Plaintiffs, but breached those duties by committing tortious acts against the Plaintiffs.

217.    These Sales Representative Defendants were sales representatives and agents for Novartis Defendants whose employment responsibilities included promoting, marketing, distributing and selling pimecrolimus.

47

218.    The Sales Representative Defendants' jobs included, but was not limited to, making office calls to healthcare providers and/or members of their professional staff for the express purposes of promoting, marketing, distributing, and selling pimecrolimus.

219.    These Sales Representative Defendants had specialized and technical training for and knowledge about pimecrolimus.  These Sales Representative Defendants had access to scientific, research, marketing and other relevant information which enable them to perform their jobs. In addition, they were specifically trained and counseled by Novartis Defendants, about the safety and adverse health risk associated with the use and application of pimecrolimus, and had access to information about the safety and health risks of the drug.

220.    These Sales Representative Defendants had superior knowledge to that of an individual person, including Plaintiffs' treating physician, because of their professional training, education and status as sales representatives/detail persons and agents for Novartis Defendants in the sale, promotion, marketing and distribution of pimecrolimus.

221.    As part of their specific job responsibilities, these Sales Representative Defendants marketed, promoted, and distributed pimecrolimus to Plaintiffs' treating physician. The Sales Representative Defendants performed these duties with the knowledge that Plaintiffs' treating physician would in turn provide samples of pimecrolimus to his patients who were diagnosed with a skin disease for which pimecrolimus was designed and intended to treat, as well as having Plaintiffs' treating physician write prescriptions for patients with those diseases.

222.    As early as 2001, these Sales Representative Defendants knew or should have known of the dangerous health risks, such as the development of malignancies resulting from the use and application of pimecrolimus.  Despite this knowledge, the Sales Representative Defendants continued to distribute, market, or sell pimecrolimus to healthcare providers, and

48

specifically to Plaintiffs' treating physician. These Sales Representative Defendants knew that the distribution, marketing or sale of pimecrolimus to Plaintiffs' healthcare provider would result in the healthcare provider prescribing pimecrolimus to his patients with skin diseases for which the product was designed to treat, and this was the specific intent of the Sales Representative Defendants.

223.    These Sales Representative Defendants failed to use reasonable care by continuing to market, distribute and sell pimecrolimus to healthcare providers, including Plaintiffs' treating physician, despite their knowledge, or what they should have known, about the health risks and inherent dangers of pimecrolimus in causing malignancies.

224.    The Sales Representative Defendants breached their respective duties of care by distributing and marketing a defective and unreasonably dangerous drug, pimecrolimus.

225.    As a direct and proximate result of Sales Representative Defendants' negligence, Plaintiffs have sustained serious and permanent injuries, including but not limited to, damages, pain and suffering, emotional distress, fear of future diseases, psychological injuries, physical disfigurement, scarring, loss of the enjoyment of life, and risks of reoccurrence of malignancies. Plaintiffs have further incurred medical bills and other healthcare expenses. Plaintiff, Andreas Perry's physical and emotion injuries, serious adverse events and other health problems proximately caused by the use and application of pimecrolimus, are permanent and continue to compromise, diminish and suppress his natural immune system which exposes him to further health problems, physical ailments, and serious adverse events.

226.    In that the injuries suffered by the Plaintiff, Andreas Perry, are continuing in nature, he will continue to suffer, pain, psychological and emotional injuries, physical handicap and permanent injury in the future, will be further compelled to expend great sums of money for

# EXHIBIT "F"

# CENTER FOR MEDICAL CONSUMERS

WORKING TO PROTECT YOUR RIGHTS - HELPING YOU MAKE INFORMED DECISIONS

**Home   Advocacy     Our Articles     Surgery Volumes          About Us          Links**

## Protopic and Elidel: Eczema Drugs Have a Cancer Risk

Early this year, the Food and Drug Administration issued a warning about two prescription topical creams for the common skin disease, eczema. Both Elidel and Protopic must now include written material for professionals and patients that warns of a cancer risk based on "information from animal studies, case reports in a small number of patients, and knowledge of how drugs in this class work." Though the warning says, "a small number" of people who have used the products "have had cancer (for example, skin or lymphoma)," evidence from the FDA's own reporting system indicates that this may be an understatement. Pretty alarming for drugs that are applied to the skin, primarily for young children. Doubly so, considering the fact that less than 10% of all serious adverse drug reactions are reported to the FDA.

People with eczema, also known as atopic dermatitis, and parents of children with this chronic skin disorder are often desperate for a treatment that alleviates the severe itchiness and inflammation. Eczema primarily afflicts babies and children, but can continue into adulthood in about 50% or show up (rarely) for the first time in adulthood. There is no cure. A drug might beat it back for a short time, but flare-ups are common.

Elidel (generic name: pimecrolimus) and Protopic (generic name: tacrolimus) control eczema by suppressing the immune system, and they can be extremely effective in producing improvements. Until they came along, corticosteroid cream was the standard treatment. Hopes for the newer drugs stem from fears about the side effects of corticosteroid cream like thinning of the skin and adrenal gland suppression. Novartis, the company that makes Elidel, and Astellas Pharma (formerly Fujisawa), maker of Protopic, fed these fears by promoting their products as "steroid-free."

One example is Fujisawa's fraudulent ad for Protopic that appeared six years ago in Prevention magazine stating, "Breakthrough research has finally uncovered a new kind of medicine for eczema. Made of a natural substance, this new treatment is steroid free." The ad implies safety. But in reality both Elidel and Protopic are in the same drug class as Prograf, a powerful immunosuppressant drug that prevents liver or kidney transplant rejections. In fact, Protopic and Prograf (generic name: tacrolimus), which comes with a warning of "infection and development of lymphoma," are the *same drug*!

### FDA Explains Itself

Why hasn't the FDA withdrawn the drugs, given their obvious dangers and the existence of a safer alternative? "FDA believes that the benefits of Elidel and Protopic outweigh the risks of these products," responded Julie Beitz, MD, of the FDA's Center for Drug Evaluation and Research, who would answer questions only by e-mail by way of a press officer. "The  new warnings in the

professional labels and in the Medication Guides* for these products convey what our concerns are, however, a causal link has not been established between the reports of cancer and use of these products."

The FDA warning states that it may "take human studies of ten years or longer to determine whether Elidel or Protopic is linked to cancer." Despite the lack of long-term data and what is surely an undercount of cancers associated with use of these drugs, Dr. Beitz defends the FDA position, "While there is under-reporting of adverse events to the FDA, we also know that use of these products is great, so relative to all users, the number of reports we have received is small."

To some dermatologists, the question of whether Elidel and Protopic pose more than a rare cancer risk seems to hinge on how much is absorbed into the skin. In a January 19, 2006 press release that disagrees with the  FDA's decision to issue an warning, Clay J. Cockerell, MD, president of the American Academy of Dermatology, said, "Because these medications are applied to the skin, virtually none of it gets inside the body."

That statement was quoted to Dr. Beitz, who commented, "We agree that very little of the drug is absorbed in general, however, we have data to show that some patients do absorb the drug to greater degrees. Additional factors to consider: 1) how long the patient is using the product; 2) how large an area of skin the product is being applied to; and 3) the fact that areas affected with atopic dermatitis are not normal and may allow for more absorption." Babies under two should not be treated with either drug, according to the FDA warning.

"Infants have higher surface area to volume so they will have higher blood levels of the drug and their skin is more permeable," said Peter M. Elias, MD, professor of dermatology, University of California, San Francisco, in a telephone interview. "The companies have over-marketed these drugs suggesting, for example that they are safe for infants by showing images of infants [in promotional materials]." The ads implying Elidel and Protopic are safer than corticosteroids are ridiculous, he continued, adding that neither drug has been shown to be safer or more effective than topical steroids in a head-to-head comparison as maintenance therapy for eczema. "Low- to mid-potency steroids are quite safe in eczema, although many clinicians prefer an even less potent agent, such as hydrocortisone, in infants," said Dr. Elias.

When the FDA was deciding whether to approve these drugs in 2000, Dr. Elias wrote a letter to the agency expressing concerns, particularly about Protopic, which he described as "a powerful and potentially toxic immunosuppressive drug." In the letter, which remains on the FDA Web site, Dr. Elias told the agency that he is "alarmed at what appears to be a potentially cavalier and uncritical attitude about the indications and long-term safety of topical tacrolimus [generic name for Protopic]. [This drug] is absorbed into the circulation through inflamed skin, and in low-body weight children it can produce transient therapeutic (transplant) drug levels."

Dr. Elias sees a limited role for the drugs, "Protopic should be reserved for severe, recalcitrant flares of eczema in children and adults, and Elidel for similar bad flares in infants. Elidel might also be useful for periorbital dermatitis due to risk of glaucoma from steroids. But in all these examples, the use should be *short term*—days, weeks, but not months—and only in conjunction with sunscreens, which should always be used when these drugs are applied to sun-exposed skin. There is no rationale for long-term therapy with either drug."

### Pressure Not to Warn the Public

In the five to six years since the FDA approved each drug, Novartis and Astellas/Fujisawa mounted a massive, often misleading, advertising campaign aimed at doctors and the public. And in the last two years, both companies waged an aggressive campaign against the FDA's planned warning. Under

great pressure not to act, the FDA went ahead and called a meeting of its pediatric advisory committee in February 2005, which recommended a label change warning doctors and patients about the risk associated with both Elidel and Protopic.

The next month, a cancer warning appeared on the FDA Web site. (It is not known how many doctors or patients would think to look on the FDA's Web site for new warnings.) As of January 2006, a Medication Guide for patients with the warning is supposed to be included with all prescriptions of Elidel and Protopic. The Guide does not spell out the safe duration (if there is one) of short-term use, though makes it clear that neither drug should be the first-choice treatment for eczema.

There are reasons to think that these efforts will go unheeded. Several studies show that only one in ten doctors read the drug label which is the most complete source of information about a drug's use and harms. (Consumers are not much better.) A recent survey showed doctors are overwhelmed with drug warnings and have difficulty keeping them all straight. In the case of Protopic and Elidel, the dermatologists' professional organizations were actively working against the FDA's plan to issue a warning. The Society for Pediatric Dermatology, in a letter dated November 30, 2005, advised its members to write the FDA to tell the agency that warnings are not warranted because "abrupt discontinuation of these medications out of fear [will result] in disease flares in many children." Furthermore, the letter claimed that an analysis of the clinical data presented to the FDA have not supported a malignancy risk.

"The great resistance in the dermatologic community to the FDA warning is based in part on the fact that many of the opinion leaders are in conflict of interest situations that too often go undisclosed," said Dr. Elias, referring to funding from Novartis and Astellas that pays for the speakers bureau, conferences, and continuing education. And he doesn't think much of the evidence cited to support objections to the FDA warning about Elidel and Protopic. "There are 55 articles about the safety of both drugs that claim to be long term," Dr. Elias explained. "However, they are not, in fact, long term; the longest study lasted only six months; many are repeats—the same study published in multiple journals—and others are written by the drug company journal editor." [Note: There are longer studies indicating the drugs are safe and effective, but they are funded by either Astellas or Novartis.]

It is quite possible that one day lawsuits will generate the publicity needed to adequately warn the public about inappropriate use of Elidel and Protopic. Several law firms now have Web sites specifically devoted to the drugs. One such firm headed by Larry M. Roth has a Web site (www.protopiclawyers.com) that features his detailed article on the history of FDA approval of topical immunosuppressants and reports of serious reactions, complete with extensive footnotes. It describes cancers, deaths, and other severe reactions reported to the FDA.

In a telephone interview, Laurilyn Cook-Arrington, a paralegal at Larry M. Roth, PA, said the law firm had retrieved this information from the FDA's Adverse Events Reporting System with a Freedom of Information Act request. (Manufacturers are required "by regulation" to report serious drugs reactions to AERS.) Ms. Cook-Arrington said the firm has been gathering information on topical immunosuppressant drugs for three years. "Hundreds of potential claimants have contacted our firm in the last year. And many of these claims include deaths. Almost 50% of them are made on behalf of children. They involve skin cancers, as well as systemic malignancies like leukemia, Hodgkin's disease, and multiple myeloma."

**What to do:**

-If you are using Elidel or Protopic, inform yourself about these medications. Start with the warnings at the FDA Web site (www.FDA.gov). Consumers and doctors can report serious adverse drug reactions to the FDA's Medwatch Program 1(800) FDA-1088.

Elidel and Protopic: Eczema ﹍ ﹍gs Have Cancer Risk                                        Page 4 of 4

-Ask your doctor about prescription emollients to reduce the amount of topical drugs needed to control eczema. According to Dr. Elias, "Topical prescription emollients alter biochemical abnormalities in the skin, lead to fewer flare ups, and fight off infection." They can be used as the first treatment or as maintenance after short-term treatment with an immunomodulator, explained Dr. Elias, who is also chief science officer at Ceranix, makers of a yet-to-be-available emollient, EpiCeram.

Maryann Napoli, Center for Medical Consumers © May 2006

Maryann Napoli, Center for Medical Consumers ©, February 2006

© 2005 Center for Medical Consumers
The Center for Medical Consumers cannot respond to inquiries regarding individual health concerns.
Our Web site is updated during the first two weeks of each month.
Please send any comments or questions to medconsumers@earthlink.net

JS-44
(Rev. 12/96)

# CIVIL COVER SHEET

MAGISTRATE JUDGE
VITUNAC

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purposes of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS
Brandon Butzberger, a minor, by and through his parent and natural guardian David Butzberger,

## DEFENDANTS
Novartis Pharmaceuticals Corporation,

NIGHT BOX
FILED

06-80700 CIV-RYSKAMP

JUL 20 2006

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF: Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

9:06 CV 80700-Ryskamp-Vitunac

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT New Jersey
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Larry M. Roth, Esq. Law Offices of Larry M. Roth, P.A., 1615 Edgewater Dr., Suite 180, Orlando, FL  32854 (407) 872-2239

ATTORNEYS (IF KNOWN)
Stacey Sutton, Esq., Carlton Fields, P.A., 222 Lakeview Ave., Suite 1400, West Palm Beach, FL  33401 (561) 659-7070

**(d)** CHECK BOX FOR COUNTY WHERE ACTION AROSE:  ☐DADE ☐MONROE ☐BROWARD ☒PALM BEACH ☐MARTIN ☐ST. LUCIE ☐INDIAN RIVER ☐OKEECHOBEE ☐HIGHLANDS

## II.  BASIS OF JURISDICTION
(PLACE AN X ONE BOX ONLY)

☐ 1. U.S. Government (Plaintiff)

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 2. U.S. Government (Defendant)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF
(FOR DIVERSITY CASE ONLY)                          AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizens of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV.  ORIGIN
(PLACE AN "X" IN ONE BOX ONLY)

☐1 Original Proceeding  ☒2 Removed from State Court  ☐3 Remanded from Appellate Court  ☐4 Reinstated or Reopened  ☐5 Transferred from another district (Specify)  ☐6 Multidistrict Litigation  ☐7 Appeal to District Judge from Magistrate Judgment

## V.  NATURE OF SUIT
(PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | PERSONAL INJURY | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers Liability | B☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | PERSONAL INJURY | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 370 Other Fraud | B☐ 690 Other | B SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders Suits | ☐ 350 Motor Vehicle | | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | A LABOR | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | A CIVIL RIGHTS | ☐ 720 Labor/Mgmt Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land condemnation | ☐ 441 Voting | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | | | |

A TORTS

PERSONAL INJURY
☐ 362 Personal Injury - Med Malpractice
☒ 365 Personal Injury – Product Liability
☐ 368 Asbestos Personal Injury Product Liability

☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

PRISONER PETITIONS
B☐ 510 Motions to Vacate Sentence
HABEAS CORPUS:
B☐ 530 General
A☐ 535 Death Penalty
B☐ 540 Mandamus & Other
B☐ 550 Civil Rights
B☐ 555 Prison Condition

## VI.  CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.  DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

LENGTH OF TRIAL
Unknown                     Jurisdiction is pursuant to 28 U.S.C. §1332, 1441 and 1446

## VII.  REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND in excess of $75,000.

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII.  RELATED CASE(S) IF ANY:
(See Instructions)     JUDGE:_____     DOCKET NUMBER:_____

DATE:
July 20, 2006

SIGNATURE OF ATTORNEY OF RECORD

STACEY SUTTON

FOR OFFICE USE ONLY
RECEIPT #: 537716     AMOUNT 360.00     APPLYING IFP:_____     JUDGE:_____     MAG. JUDGE:_____

NPB#670454.1